# United States Court of Appeals for the Federal Circuit

---

**LAKESHORE ENGINEERING SERVICES, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5094

---

Appeal from the United States Court of Federal Claims in No. 09-CV-0865, Judge Francis M. Allegra.

---

Decided: April 11, 2014

---

PHIL B. ABERNETHY, Butler, Snow, O'Mara, Stevens & Cannada, PLLC, of Rigdeland, Mississippi, argued for plaintiff-appellant. With him on the brief was LEANN W. NEALEY.

JANE C. DEMPSEY, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director.

---

Before NEWMAN, PROST, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Lakeshore appeals from a decision of the United States Court of Federal Claims granting summary judgment in favor of the government in a contract dispute. The court held that Lakeshore had not identified evidence that, even if credited, would allow it to prevail at a trial on its claims of breach of contract, breach of implied warranty, breach of the duty of good faith and fair dealing, and mutual mistake. We affirm.

BACKGROUND

A

In December 2006, the United States Army Contracting Agency solicited bids for a contract for repair, maintenance, and construction services at Fort Rucker, Alabama. The contract described in the solicitation would be indefinite as to delivery and quantity, *i.e.*, as to what specific services would be provided and when. This form of contract gives the government purchasing flexibility when it does not believe that it can accurately estimate the quantity or timing of its requirements in advance. *See* 48 C.F.R. § 16.504(b). Once the contract is awarded, the government places separate job orders with the contractor for particular work, to be performed subject to pricing and other terms established in the contract. In the contract at issue in this appeal, the mechanism of pricing such jobs involves identification of costs for those jobs, including labor, equipment, and materials, and multiplication of such costs by certain "coefficients" set in the contract.

As to the costs, the contract specifies that the calculation would use unit prices found in the "Universal Unit Price Book" (UUPB) for items listed in that book. The specific UUPB at issue consists of the Gordian Group Construction Task Catalog, "created specifically for **Fort**

**Rucker, Alabama**, and published in December 2006," along with Progen® Online operating software. J.A. 350, 292. The solicitation explains that the UUPB, which states unit prices for labor, equipment, and materials, "contains pricing information (i.e., Government Estimate) . . . to be used by the Contractor in development of price proposals for each work order." J.A. 320.

As to the "coefficients" that would be multiplied by the costs, the solicitation states that bidders, in deciding what coefficients to offer, should set them to represent "costs (generally indirect costs) not considered to be included in the Universal Unit Price Book (UUPB) prices." J.A. 291. The solicitation explains that the coefficients must "contain all costs other than the prepriced unit prices, as no allowance [would] be made after award." J.A. 292. The solicitation enumerates several factors that had to be included in the offerors' coefficients, one of which is "[o]ther risks of doing business (i.e., risk of a lower than expected contract dollar value; risk of poor subcontractor performance and re-performance)." J.A. 292.

One focus of the parties' dispute here involves the particular language of the solicitation concerning the UUPB. In saying that "all work shall be accomplished in accordance with the following documents enclosed as attachments of this solicitation/contract," including the UUPB "modified for Fort Rucker," the solicitation states that "[t]he UUPB, consists of Divisions 1 through 16 [of the Task Catalog] that are applicable to Divisions 1 through 16 of the Job Order Contract Technical Specifications." J.A. 320 (comma in original); *see* J.A. 284 (solicitation table of contents indicating that attachment 2 is the "Progen Unit price Book (UPB), Divisions 1 through 16"). Although that language specifies only Divisions 1 through 16, the attachments to the solicitation include not only those Divisions but also the introductory section of the Task Catalog. J.A. 350-60. That section provides instructions about how to use the Task Catalog, how the prices in

the book are calculated, what is and is not included in the published unit prices, and adjustment factors that a bidder should take into account in determining its coefficient, including "[b]usiness risks such as the risk of a lower than expected volume of work, smaller than anticipated Job Orders, poor Subcontractor performance, and inflation or material cost fluctuations." J.A. 355. The introduction specifically warns potential contractors that, "[w]hile diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." J.A. 356. The introduction further states that the list of adjustment factors is "not exhaustive," that "[n]o additional payments of any kind whatsoever will be made," and that "[a]ll costs not included in the unit prices must be part of the Adjustment Factors." J.A. 356-57.

Lakeshore responded to the solicitation and submitted a bid with a coefficient of 1.28 to be used for work done during normal working hours, 1.46 for overtime working hours, and 1.22 for line items not reflected in the UUPB. In the pricing portion of its proposal, which included the coefficients, Lakeshore represented that it had "thoroughly reviewed the [U]UPB and compared major line items with [its] actual cost experience on past projects." J.A. 843. An unquestioned premise of Lakeshore's argument in this case is that, at the time of the government's solicitation and Lakeshore's review in preparing its bid, it was well known that construction costs in the region of Fort Rucker had increased in the aftermath of Hurricane Katrina, which occurred in late summer 2005—fifteen months before the government solicited bids for the contract at issue here. *See* Oral Argument at 32:31-52; J.A. 389-90.

Lakeshore did at least two things to investigate the UUPB prices in order to decide how it should set its coefficients. It "perform[ed] a sample analysis of the cost

factors for a known past renovation project": it "provided the scope of work" on that project to its "major subcontractors and obtained their prices" for that work, then compared those prices with an estimate that it had prepared based on the UUPB. J.A. 843. It found that "[o]verall the [U]UPB prices [were] less than [its] actual past cost experience." J.A. 843. Lakeshore also contacted All Star, the previous contractor on the project. Lakeshore's understanding, based on its conversations with All Star, was that All Star believed that the prices in the UUPB did not reflect the increase in the cost of materials that had occurred during 2005 and were, in fact, too low. As a result of its investigation, Lakeshore concluded that the UUPB prices were too low, and to compensate for that underpricing, it included in its bid (as to normal working hours and overtime) coefficients that were six percent higher than its ordinary coefficients.

The Army awarded the contract to Lakeshore on April 26, 2007. The contract includes all terms, conditions, and provisions set forth in the solicitation. In the year following entry into the contract, Lakeshore began 78 construction projects at Fort Rucker. J.A. 522-24. When the Army exercised its option to continue the contract beyond the base year, it increased payments based on a price-adjustment clause in the contract, which provides for adjusting coefficients for the "option years" based on a Building Cost Index for the construction industry. In particular, after the base year, the coefficient for normal working hours was raised from 1.28 to 1.32. Lakeshore began an additional 74 delivery orders under the contract in the first option year. J.A. 524-27.

B

After two years under the contract, Lakeshore concluded that it had incurred higher costs for its work than were covered by the payments made under the contract, whether because the UUPB prices were inaccurate at the

time of contracting or because prices had risen for certain inputs—notably, steel and gasoline—after the contract was made. Lakeshore requested an equitable adjustment of contract prices, but the government denied the request. On March 10, 2009, Lakeshore filed a claim for equitable adjustment with the contracting officer pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 7101 *et seq.*, seeking recovery of $1,996,152.40 for losses it allegedly incurred in performing the contract. After the contracting officer rejected the claim, Lakeshore filed a complaint in the Court of Federal Claims alleging breach of contract, breach of the covenant of good faith and fair dealing, breach of implied warranty, and mistake.

The government moved for summary judgment on all counts of the complaint, and the Court of Federal Claims granted the motion. *Lakeshore Eng'g Servs., Inc. v. United States*, 110 Fed. Cl. 230, 238-43 (2013). Addressing Lakeshore's core contention that the government breached the contract by paying Lakeshore based on unit prices that did not accurately reflect local rates for labor, materials, and equipment, the court concluded that the government simply did not "assume[] the obligation to provide offerors with accurate local prices" or agree to bear "the economic consequences if one or more prices in the guide proved inaccurate." *Id.* at 238. The court relied on the language of the contract stating that the contractor's coefficient(s) must reflect "'risks of doing business'" and "'contain all costs other than the pre-priced unit prices, as no allowance will be made after award.'" *Id.* It relied, too, on the various warnings in the introductory section of the UUPB, which it concluded was "essential" for contractors to "appropriately or effectively" use the other UUPB chapters and, therefore, should be deemed incorporated into the solicitation. *Id.* at 238-39.

The court also held that the government did not breach the contract in denying Lakeshore an equitable adjustment for inflation. *Id.* at 241. The court explained

that the contract does not include any of the Federal Acquisition Regulation (FAR) provisions that allow for cost reimbursement. *Id.* at 239-40. With respect to the separate price-adjustment clause—which provides for an annual re-indexing of the coefficient based on a prescribed methodology—the court explained that Lakeshore offered no evidence that the government misapplied the methodology or, therefore, the clause. *Id.*

In addition, the court rejected Lakeshore's claim that the government breached the implied covenant of good faith and fair dealing by refusing to adjust the contract prices. *Id.* at 240. The court explained that there is no such claim where, as here, the court has already concluded that the contract placed the risk of error in pricing on Lakeshore; the implied duty does not negate that result by guaranteeing against loss from such error. *Id.* The court further rejected reliance on the implied-warranty ruling of *United States v. Spearin*, 248 U.S. 132, 136 (1918), where the government went beyond contracting for a certain result (which the Supreme Court said generally leaves the risk of unforeseen difficulties on the contractor) and instead forced detailed design specifications on the contractor (which the Court held carried an implied warranty that the resulting product would not be defective or unsafe). *Lakeshore*, 110 Fed. Cl. at 240 n.13; *see Hercules, Inc. v. United States*, 24 F.3d 188, 197 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996). The present case, the Court of Federal Claims concluded, does not involve a design specification proving defective or unsafe. *See Lakeshore*, 110 Fed. Cl. at 240 n.13.

Finally, the Court of Federal Claims rejected Lakeshore's request for contract reformation based on mutual mistake, concluding specifically that Lakeshore's proof was insufficient to support a finding that the parties were mistaken in their belief regarding a basic assumption underlying the contract. *Id.* at 242. Lakeshore relied on evidence that its costs, in the years after publication of

the 2006 UUPB, exceeded the prices listed in the UUPB, but the court explained that this "is proof neither that its costs were reasonable nor that there was any systematic problem with the prices in the book." *Id.* The court also found that Lakeshore failed to support its claim that the Army mistakenly believed that the UUPB had been updated even though it had not been. *Id.* The court explained that the UUPB had, in fact, been partially updated: although the majority of the 70,000 entries in the UUPB remained unchanged, the material price indicators had been adjusted before the solicitation issued. *Id.* And in any event, the court concluded, even if Lakeshore could show that the parties were mistaken in their belief regarding a fact underlying the contract, Lakeshore still could not prevail on its mutual-mistake claim because Lakeshore bore the risk that performance costs could increase, and this fact alone was enough to defeat its claim. *Id.* at 242-43.

Lakeshore appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review a grant of summary judgment by the Court of Federal Claims without deference. *American Capital Corp. v. FDIC*, 472 F.3d 859, 865 (Fed. Cir. 2006).

### A

Lakeshore argues that it identified enough evidence to permit a finding that the government breached the contract in two ways, involving market prices at two different times. Lakeshore alleges that the government breached the contract (1) by paying Lakeshore based on unit prices that, at the time of entry into the contract, did not accurately reflect the then-prevailing local prices for labor, material, and equipment and (2) by not allowing for equitable adjustments for the inflation of costs that occurred after the parties entered into the contract,

during its performance. We agree with the Court of Federal Claims that, in both respects, Lakeshore did not create a genuine issue of material fact on its claim of breach.

1

In rejecting Lakeshore's principal claim of breach, involving the accuracy of the UUPB prices at the time of contracting, we do not rely on the conclusion of the Court of Federal Claims that the contract incorporates the introductory section of the UUPB—which provides detailed instructions about how to use the catalog, the adjustment factors that a bidder should take into account in determining its coefficient, and specific warnings about pricing and other matters. To incorporate extrinsic material, a contract must use language that leaves no relevant "ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008); *see Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010). Here, the UUPB introduction is not specifically mentioned in the solicitation, but it is attached to the solicitation and is closely related to the expressly incorporated material (Divisions 1 through 16).

We need not decide whether the standard for incorporation is met in these circumstances. We think that the Court of Federal Claims was correct for reasons independent of any such incorporation: the only reasonable conclusion on the evidence here is that any risk that the prices in the UUPB were inaccurate at the time of contracting was borne by Lakeshore. Even if we were to find an inadequate basis for finding incorporation, we would not draw the opposite inference Lakeshore urged at oral argument: we would not infer from the absence of incor-

poration of the introduction a negation of the allocation of risk of error established by the other evidence.

First, the language of the contract does not promise that the prices in the UUPB were accurate or place on the government the risk that they will turn out to be inaccurate. To the contrary, the solicitation states that the prices in the UUPB are a "Government Estimate" and that "no allowance will be made after award." J.A. 320, 292. Indeed, the solicitation clearly states that each task order issued for the performance of work is a "Firm Fixed-Price" contract. J.A. 331. The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs. 48 C.F.R. § 16.202-1; *Spearin*, 248 U.S. at 136; *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996) ("Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract."). That allocation of risk must include the unit prices at the core of the contract.

Second, the solicitation reinforces the allocation of risk by affirmatively pointing the potential contractor to the mechanism it should use in its bid to account for potential error in the 2006 UUPB prices. It requires that Lakeshore's coefficient take into account "all costs other than the prepriced unit prices," and it provides a non-exclusive list of the factors that the coefficient must include, one of which is "[o]ther risks of doing business." J.A. 292. This language, together with the language already quoted, put offerors on notice that there would be no adjustments made to the contract other than as specifically provided for and that it was their responsibility to set their proposed coefficients at a level that would protect their interests in making the contract profitable.

Third, Lakeshore's own actions make clear that it understood that it was responsible for checking the 2006 UUPB unit prices and setting its coefficients accordingly. In the pricing portion of its bid, Lakeshore represented to the government that it had "thoroughly reviewed the [U]UPB and compared major line items with [its] actual cost experience on past projects" and that the UUPB prices were less than its "actual past cost experience." J.A. 843. Lakeshore also understood from the previous contractor on the project that the prices in the UUPB were too low. And Lakeshore then took action that confirms it was *not* relying on the accuracy of the 2006 UUPB prices: it adjusted its principal coefficients upward by six percent above their ordinary levels based on its belief that the UUPB prices were too low.

In these circumstances, Lakeshore's principal claim of breach is unsupported. Lakeshore has advanced no evidence that could support a finding that the government represented that the UUPB prices were accurate and could be relied on by Lakeshore, with the government assuming the risk of error in those prices. Lakeshore therefore has no claim of breach based on inaccuracy of those prices at the time of contracting.

2

Lakeshore has no better argument for breach based on the government's refusal to allow equitable adjustments for inflation of costs that occurred after the contract was made. Lakeshore argues that the incorporation of the Department of Defense FAR Supplement provision at 48 C.F.R. § 252.243-7002 (a procedural provision for requests for equitable adjustments) and the inclusion of a price-adjustment provision in the contract support a broader conclusion that the government must compensate it for cost increases beyond the terms of those provisions. That argument is incorrect: if accepted, it would erase the

careful limits on the adjustments the government actually agreed to make.

Lakeshore has shown no breach of the actual adjustment promises. It is a necessary condition for an adjustment under the FAR provision that the increased contractor cost be the result of a change to the contract made by the government. *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *see* 48 C.F.R. §§ 52.243-4, 252.243-7002. Lakeshore's claim is not based on any such government modification; the claim that prices rose during the term of the contract does not entitle Lakeshore to equitable adjustment under the FAR provision. Similarly, the price-adjustment clause of the contract, 48 C.F.R. § 5152.237-9000, entitled Lakeshore to an upward adjustment only under the bargained-for methodology, using the Building Cost Index. J.A. 318. Lakeshore makes no argument that the government misapplied that methodology in calculating the 4% increase that Lakeshore received for the first option year.

In short, having agreed to the limited adjustment clauses in this fixed-price contract, Lakeshore cannot now rewrite the clauses to provide it protections the government did not agree to. *See ConocoPhillips v. United States*, 501 F.3d 1374, 1379 (Fed. Cir. 2007) ("If the plaintiffs had felt that a different method of adjusting market prices would be more appropriate and if the issue was sufficiently important to them, they could have objected to the use of the [Build Cost Index methodology]; if the government had insisted on using the [methodology], they could have declined to enter into the contracts.").

B

We also agree with the Court of Federal Claims that Lakeshore created no triable issue on its claim that the government breached an implied-in-fact warranty in the contract. To recover for a breach of implied warranty, a plaintiff must allege and prove (1) that a valid warranty

existed, (2) the warranty was breached, and (3) the plaintiff suffered harm caused by the breach. *Hercules*, 24 F.3d at 197. Lakeshore's implied-warranty argument rests on the allegation already rejected—that the government warranted that the prices contained in the UUPB were accurate. This claim therefore fails for the same reasons as Lakeshore's principal breach-of-contract claim.

*United States v. Spearin, supra*, does not change this conclusion. As *Spearin* makes clear, and this court has explained, the Supreme Court in *Spearin* recognized that an implied warranty arises in a particular circumstance: when a contractual requirement binds the builder to follow design specifications stated in the contract, an implied warranty arises that the resulting work will not be defective or unsafe. *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000); *Hercules*, 24 F.3d at 197. *Spearin* itself contrasted that circumstance with a general (though changeable) rule that a contractor, agreeing to build something for a fixed price, retains the risk of cost increases from "unforeseen difficulties" not caused by new actions of the other party. 248 U.S. at 136. The present case does not involve a design specification that bound Lakeshore but turned out to produce a defective or unsafe construction. Lakeshore's warranty claim is only that the government warranted the accuracy of certain prices at the time of contracting—which is not a *Spearin* claim and which we have already rejected as unsustainable given the contract and the evidence.

## C

The Court of Federal Claims correctly held, as well, that Lakeshore could not establish that the government breached the covenant of good faith and fair dealing. *Lakeshore*, 110 Fed. Cl. at 240. Every contract implicitly contains a covenant of good faith and fair dealing, keyed to the obligations and opportunities established in the contract. *First Nationwide Bank v. United States*, 431

F.3d 1342, 1349 (Fed. Cir. 2005); *see Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990-92 (Fed. Cir. 2014). The covenant imposes on each party a "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

Lakeshore argues that the government breached the duty when, after learning that the UUPB prices were inaccurate and that the contract did not adequately compensate Lakeshore for cost increases, it did not modify the contract to raise the prices paid to Lakeshore. But this argument cannot support a claim of implied-duty breach without overriding the fundamental decision in this fixed-price contract that the contractor, not the government, would bear the risk of any inaccuracy in the pre-contract prices used for bidding (which the contract gave the contractor a mechanism to address in its bid) and of post-contract changes in market prices for the contractor's inputs beyond those covered by the specific price-adjustment clauses. What Lakeshore bargained for, and received, was payment based on unit prices set forth in the UUPB multiplied by its bid coefficients, modified by certain limited post-contract adjustments. Given this bargain, the government's refusal to pay Lakeshore more cannot be said to have destroyed Lakeshore's reasonable expectations under the contract.

D

Finally, the Court of Federal Claims correctly rejected Lakeshore's claim that it is entitled to a reformation of the contract, to increase the payments for its work, based on the doctrine of mutual mistake. To support its claim of mutual mistake, Lakeshore must show that (1) the parties to the contract were mistaken in their belief regarding a fact; (2) the mistaken belief constituted a basic

assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). Lakeshore alleges that the mistakenly believed facts here were the accuracy of the UUPB prices at the time of contracting and the adequacy of the contractual price-adjustment mechanism.

It suffices to reject this claim of mistake that the contract placed the risk of mistake in both respects on Lakeshore, not the government. We have already so concluded in our discussion of Lakeshore's two breach-of-contract claims: the contract placed the risk of any initial inaccuracy in the UUPB prices on Lakeshore, and it did the same for inflation after work began, by carefully circumscribing the bases for adjustment. Those conclusions mean that there is no triable issue on the risk-allocation element required for Lakeshore's claim of mutual mistake, thus defeating that claim. *Nat'l Presto Indus., Inc. v. United States*, 338 F.2d 99, 108 (Ct. Cl. 1964).

The Court of Federal Claims discussed, and the parties dispute, other requirements for relief based on mutual mistake as well, and the evidence may fall short on one or more of those requirements. Notably, as to Lakeshore's first claim of mistake, adding some precision to the claim reveals problems in the claim. Thus, Lakeshore cannot assert a mutual mistake about any belief that *all* of the UUPB prices were accurate, because it plainly knew that some were inaccurate and more might be (and set its proposed coefficients to address that possibility); and if Lakeshore means to assert a mutual belief that *most* of the prices were accurate at the time of contracting, the Court of Federal Claims concluded that Lakeshore did not point to evidence that any such belief about prices overall was mistaken. *See Lakeshore*, 110 Fed. Cl. at 242 ("[T]he record lacks support for plaintiff's claim that, in any

comprehensive way, the prices in the [UUPB] failed to reflect local prices."). As to Lakeshore's second claim of mistake: Even if the parties mutually believed that the contractual price-adjustment mechanism would be adequate, that is a belief about predicted future events; but we have said that a "party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined." *Dairyland*, 16 F.3d at 1203. We need not pursue those issues further, however, because the claim of mutual mistake fails on the risk-allocation element regardless.

CONCLUSION

A fundamental aspect of contracts for future performance is how they allocate risks related to the performance. Here, Lakeshore did not secure protection in the contract against either of the risks it says matured into unexpected costs—that certain prices in the contract did not accurately reflect input costs at the time of contracting or that, once work began, costs would increase as much as Lakeshore says they did. Without protection against those risks, no contract-law doctrine applies here to allow Lakeshore to prevail on its claims. The Court of Federal Claims therefore properly rejected those claims on summary judgment.

**AFFIRMED**