# United States Court of Appeals for the Federal Circuit

---

**DG21, LLC,**
*Appellant*

v.

**RAYMOND E. MABUS,
SECRETARY OF THE NAVY,**
*Appellee*

---

2015-1830

---

Appeal from the Armed Services Board of Contract Appeals in No. 57980, Administrative Judge John J. Thrasher.

---

Decided: May 6, 2016

---

JOHN C. DULSKE, Law Offices of Dulske & Gluys, P.C., San Antonio, TX, argued for appellant. Also represented by JOAN KELLEY FOWLER GLUYS.

DOMENIQUE GRACE KIRCHNER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR.; RUSSELL SHULTIS, Office of Litigation, United States Navy, Washington, DC.

---

Before PROST, *Chief Judge,* NEWMAN and LOURIE, *Circuit Judges.*

LOURIE, *Circuit Judge.*

DG21, LLC ("DG21") appeals from the decision of the Armed Services Board of Contract Appeals (the "Board") denying an appeal from the final decision of the contracting officer ("CO") denying DG21 an equitable adjustment to account for escalated fuel costs under a government contract. *See DG21, LLC*, ASBCA No. 57980, 15-1 BCA ¶ 36016 (Mar. 3, 2015); *see also* Joint App. ("J.A.") 1–26. For the following reasons, we affirm.

BACKGROUND

The Department of the Navy ("the Navy") maintains a support facility at Diego Garcia, a small atoll in the Indian Ocean. J.A. 36–37. The atoll occupies approximately 10.5 square miles in area, and is located approximately 1,800 miles east of the coast of Africa and 1,200 miles south of the southern tip of India. J.A. 36. Access to Diego Garcia is restricted to military personnel, authorized government personnel, and contractors of the United States or United Kingdom, and there is no commercial or civilian infrastructure. J.A. 38.

In September 2005, the Navy issued a solicitation for bids on a firm fixed-price contract to provide base operating support services at Diego Garcia. J.A. 39. The services to be performed by the contractor varied widely, from information technology services to refuse collection and recycling. J.A. 39. In addition to providing the services themselves, the contractor was required to implement a fuel conservation initiative, with a goal of cumulatively reducing fuel use by 10% per year of the contract. J.A. 48–49. Success in the fuel conservation initiative was responsible for 10% of the contractor's award-fee pool each year. J.A. 50.

The solicitation identified two categories of fuel used under the contract. J.A. 115, 116. The first category, "government-furnished fuel," was provided by the Navy to the contractor without any payment required, and could be used for most of the services in the contract. J.A. 115. The second category, which applied to all contractor base support vehicles and equipment ("BSVE") and labelled as "contractor-furnished fuel," was in fact also provided by the Navy. Rather than being provided without payment, however, the solicitation required the contractor to reimburse the Navy for that fuel "at the prevailing DoD [Department of Defense] rate at the time of purchase." J.A. 116. The solicitation indicated that the reimbursement program was "to ensure that the fuel conservation program achieves its full impact throughout the life of the contract." J.A. 115. The solicitation also provided historical fuel prices and usage rates for contractors to use in crafting their bids. J.A. 116.

The solicitation incorporated by reference several provisions of the Federal Acquisition Regulations ("FAR"). J.A. 136. One incorporated provision provides that:

(a) The Contracting Officer may, at any time . . . by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

. . .

(3) In the Government-furnished facilities, equipment, materials, services, or site[.]

. . .

(b) Any other written or oral order . . . from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circum-

stances, and source of the order and (2) that the Contractor regards the order as a change order.

. . .

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of . . . performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

48 C.F.R. § 52.243-4 (1987).

DG21 submitted a bid on the solicitation, and performed calculations to determine how much contractor-furnished fuel it expected to consume. J.A. 57–58. It arrived at "a significantly lower number of gallons than the total gallons" reflected in the solicitation, and so its fuel estimate was significantly less than the Navy's. J.A. 58. DG21 also indicated that if fuel rates varied from historical rates by 10% or more, it would request an equitable adjustment, but that it would not escalate the amount of costs over the life of the contract. J.A. 232.

The Navy responded that "[t]he historical fuel consumption and rates" were "provided for informational purposes only." J.A. 234. The Navy also clarified that as the solicitation was firm fixed-price, "DG21 assumes the full risk of consumption and/or rate changes. Please price your proposal accordingly. Please review and correct/adjust as appropriate." J.A. 234. The Navy also questioned DG21's decision not to include an escalation clause, and accordingly requested clarification and confirmation of DG21's intentions regarding its rates. J.A. 233–34. DG21 did not change its estimate of fuel costs, reasoning that although fuel prices "fluctuate dramatically from year-to-year . . . [it] believes that fuel costs overall should decrease through the Energy Efficiency Program." J.A. 235. Accordingly, DG21 took the position that fuel

costs did not need to be escalated and therefore did not change its pricing. J.A. 235. DG21 also removed the provision from its proposal indicating that it would seek an equitable adjustment if fuel prices changed more than 10%. *See* J.A. 236–38. DG21's final proposal was accepted, and DG21 was awarded the fixed-price contract on July 6, 2006. J.A. 239, 241. The total estimated price for the contract was $455,292,490. J.A. 241.

During the course of the contract, fuel prices—and thus the prevailing DoD rate for fuel—rose dramatically, reaching a maximum of more than double the historical rate indicated in the solicitation. *See* J.A. 106–07. At one point, DG21 sought to cap the price for fuel at a 10% change from historical rates, despite having removed that language from its final proposal. J.A. 287–88. The Navy did not accept that request, and DG21 dutifully reimbursed the Navy for all "contractor-provided" fuel that it consumed. J.A. 122–23.

On July 8, 2011, DG21 requested an equitable adjustment to account for the unexpected increase in fuel costs. J.A. 100–02. DG21 calculated the weighted average of prices before contract performance began as $1.75 per gallon, and calculated the requested adjustment by subtracting the amount it would have paid at $1.75 per gallon from the amount actually paid. J.A. 106–07. DG21 reasoned that because the government determined the prevailing DoD rate and invoiced DG21 for fuel, the change in fuel price was a "change" to the contract under FAR § 52.243-4. Accordingly, DG21 requested an equitable increase of $1,171,475.90. J.A. 100–02.

The CO denied DG21's request. The CO stated that the historical rates had been provided for informational purposes only and that the price fluctuations were not changes to the contract under FAR § 52.243-4. J.A. 131–32. DG21 appealed the CO's denial to the Board.

After exhaustively reviewing the record, the Board denied DG21's appeal. The Board reasoned that even if FAR § 52.243-4 applied to the contractor-furnished fuel, fluctuations in the prevailing DoD rate of fuel would not constitute a change under the changes clause. J.A. 22. The Board found that the contract language anticipated fluctuations in the market, and that the FAR did not reallocate the risk of changes to the Navy. J.A. 22–23. Moreover, the Board found that DG21's proposed interpretation would undermine the purpose of the contract— to conserve fuel. J.A. 23. The Board reasoned that if DG21 did not bear the risk of market fluctuations, it would have little incentive to conserve fuel or establish a fuel conservation program. J.A. 23. Finally, the Board also rejected DG21's argument that the Navy constructively changed the contract by charging more than the fuel price listed in the solicitation because the plain language of the contract contemplated market fluctuations in the fuel price. J.A. 24.

DG21 timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

We review the Board's conclusions of law, including its interpretation of a contract, *de novo*. *Gen. Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013). Still, we give the Board's determination "careful consideration due to the [B]oard's considerable experience in construing government contracts." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1577 (Fed. Cir. 1994). We will affirm the Board's factual determinations if they are "based on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gen. Dynamics Corp.*, 714 F.3d at 1378 (quoting *E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004)).

DG21's principal argument is that the Board erred when it determined that FAR § 52.243-4 did not allocate

the risk of market fluctuations in fuel prices to the Navy. DG21 does not contend that the contract is ambiguous, and specifically admits that "the plain and unambiguous meaning of DG21's contract—which includes any properly incorporated terms—controls the dispute concerning the risk allocation associated with increases in the prevailing DoD rate for government-furnished materials." Appellant's Br. 12. The Navy responds that the contract allocates the risk of fuel price fluctuations to DG21, that a change in the price of fuel was not a "change" within the meaning of the FAR, and that DG21's interpretation undercuts the goal of the fuel conservation program. Appellee's Br. 16–33.

We agree with the Navy that the Board did not err in denying the request for an equitable adjustment for increased fuel costs. The contract specifically states that DG21 would purchase fuel "at the prevailing DoD rate at the time of purchase." J.A. 116. DG21 was only charged that prevailing DoD rate for fuel, and does not contend otherwise. DG21 also does not allege that DoD inflated the prevailing rate in an effort to force DG21 to pay for programs not covered by the contract. *See Raytheon Missile Sys., Co.*, ASBCA No. 57594, 13-1 BCA ¶ 35,264. Because the contract indicates that DG21 would be charged the prevailing DoD rate, and DG21 was only charged the prevailing DoD rate, there was no change to the contract that would trigger FAR § 52.243-4.

DG21's arguments do not convince us otherwise. The contract uses the phrase "prevailing DoD rate at the time of purchase" to describe the price that DG21 would pay for fuel, rather than stating a specific price that DG21 would pay. J.A. 116. By referencing the "prevailing DoD rate at the time of purchase," rather than a specific price, the contract conveyed that the price for fuel could vary as the prevailing DoD rate varied; the contract conveys that the price will vary depending on the "time of purchase." J.A. 115–16. Accordingly, a variable fuel price was a

specific part of the contract. Indeed, the lack of a specific price that DG21 would be charged for fuel reveals a problem with the manner in which DG21 calculated the equitable adjustment that it seeks. Because the contract does not indicate a specific dollar amount that DG21 will be charged per gallon, DG21 instead grounds its requested adjustment in a price cap that it proposed based on historical data that the Navy provided "[f]or informational purposes only," J.A. 116, but did not ever agree to, *see* J.A. 287–88. If we were to hold the Navy to prices that it provided to prospective bidders for merely informational purposes, the Navy would have little incentive to include such prices in future solicitations.

Consistent with the general rule that "[t]he essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs," *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014), the "prevailing DoD rate" provision also allocates the risk of fluctuating fuel prices to DG21. If DG21 wanted to protect itself from rising fuel prices, it could have bargained for such protections. *See id.* at 1348. Instead, during the bid process, DG21 told the Navy that the Navy had overestimated the cost of fuel under the contract; the Navy responded that fuel prices fluctuated and that DG21 was "assum[ing] the full risk of consumption and/or rate changes," J.A. 234; and DG21 elected not to adjust its cost projections upward, J.A. 58, 234–35. DG21 itself recognized that "[f]uel prices fluctuate dramatically from year-to-year," J.A. 235, but did not include an escalation provision in its bid, and removed from its final bid the provision indicating that it would seek an equitable adjustment if fuel prices varied more than 10%. *See* J.A. 235–38. Having failed to protect itself during contract negotiation, despite specifically recognizing the volatility of fuel prices, DG21 "cannot now rewrite the clauses to provide it protections the government did not agree to." *Lakeshore Eng'g*, 748 F.3d at 1348. Accord-

ingly, the increase in fuel prices was not a change to the contract triggering FAR § 52.243-4; the contract allocated to DG21 the risk of rising fuel prices.

## CONCLUSION

We have considered the remaining arguments, but find them unpersuasive. For the foregoing reasons, the decision of the Board is affirmed.

**AFFIRMED**