ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Jabez-Absher Small Business Joint Venture | ) | ASBCA No. 63898 |
| | ) | |
| | ) | |
| Under Contract No. W912DW-22-C-0011 | ) | |

APPEARANCES FOR THE APPELLANT:　　Mr. Stephen Montalvo
　　　　　　　　　　　　　　　　　　　　Project Executive
　　　　　　　　　　　　　　　　　　Kainui M. Smith, Esq.
　　　　　　　　　　　　　　　　　　　　Counsel


APPEARANCES FOR THE GOVERNMENT:　Michael P. Goodman, Esq.
　　　　　　　　　　　　　　　　　　　　Engineer Chief Trial Attorney
　　　　　　　　　　　　　　　　　　Benjamin T. Townsend, Esq.
　　　　　　　　　　　　　　　　　　Anna Astrakhan, Esq.
　　　　　　　　　　　　　　　　　　Eric M. Smith, Esq.
　　　　　　　　　　　　　　　　　　　　Engineer Trial Attorneys
　　　　　　　　　　　　　　　　　　　　U.S. Army Engineer District, Seattle


OPINION BY ADMINISTRATIVE JUDGE TAYLOR
PURSUANT TO BOARD RULE 11


　　　　Jabez-Absher Small Business Joint Venture (Jabez-Absher or appellant) seeks an increase in the contract price of $100,865.76 resulting from its decision to change the production facility for certain electrical equipment.  Jabez-Absher contends it was required to change the production facility since the lead time for the equipment from the original production facility had increased from 50 to 80 weeks negatively impacting the construction schedule.  Jabez-Absher further contends that it provided the U.S. Army Corps of Engineers (USACE or government) with notice of this change and the government acknowledged the change.

　　　　Jurisdiction is proper pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101–7109.  The parties have elected for the Board to decide this appeal pursuant to the Board's Rule 11 procedures.  Board Rule 11 permits the parties to waive a hearing and submit the matter for decision on the written record.  Pursuant to Rule 11, the Board decides the weight to be given the evidence and may make findings of fact on disputed facts.  Board Rule 11(d).  For the reasons stated below, the appeal is denied.

I.      The Contract

On August 23, 2022, the USACE awarded Jabez-Absher a firm-fixed price contract in the amount of $29,004,500 to repair a military barracks on Joint Base Lewis-McChord (R4, tab 3).  The contract had a completion date of 720 calendar days from the date of the notice to proceed (*id.* at 33).[1]  The government issued the notice to proceed on September 7, 2022, with an effective date of October 3, 2022, establishing a contract completion date of September 22, 2024 (R4, tab 9).  The contract stated the contractor shall supply all supervision, labor, equipment and materials necessary to perform the required work (R4, tab 3 at 33).

The contract also specifically notified Jabez-Absher that only a warranted contracting officer had the authority to change the contract's terms and conditions, and the contractor should not proceed with any attempted changes made by someone other than a warranted contracting officer without first notifying the contracting officer (R4, tab 3 at 37).  Proceeding with such unauthorized work would be at the contractor's own risk (*id.*).

The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (JUN 2007) which provides, in relevant part:

> (b) Any other written or oral order . . . from the Contracting Officer that causes a change shall be treated as a change order under this clause; *provided*, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

> (c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(*Id.* at 45) (emphasis added)

---

[1] The government's Rule 4 file is Bates numbered with a five-digit number.  We omit the leading zeros in our citations to the government's Rule 4 file.

II.     The Electrical Subcontract

Jabez-Absher issued a subcontract to Danard Electric, Inc. (Danard) to perform the electrical work on the contract (Appellant's Statement of Facts (ASOF) ¶ 3).[2] Danard contracted with the Eaton Corporation (Eaton) to manufacture the electrical components for the contract including the electrical switchgear equipment (ASOF ¶ 4). The electrical switchgear included a main switchboard (MSB) and several distribution panels, including distribution panel-C (DP-C) (R4, tab 22 at 2322-24). In a proposal dated July 13, 2022, Eaton stated that shipment of the switchgear would take up to 50 weeks (id.). The government approved the proposed Eaton switchboards for use in the switchgear on the project on February 3, 2023 (R4, tab 14). With the estimated 50 week lead time, Eaton would have delivered the switchgear including the approved switchboard to the project no later than January 19, 2024, allowing for timely project completion (ASOF ¶ 7).

On or about January 27, 2023, Danard informed Jabez-Absher that the lead time for producing the switchboard by Eaton had increased to approximately 80 weeks which could negatively impact the construction schedule (R4, tab 25 at 2340). Danard further informed Jabez-Absher that Eaton had the ability to build the switchboard at their specialty plant in Auburn, Washington with a current lead time at that plant of 40 weeks (id.). On February 16, 2023, Danard issued a change order request to Jabez-Absher in the amount of $88,660 for a "Switchboard assembly line change" (ASOF ¶ 8). The change order request provided the following in relevant part:

> The lead time for the switchboard is currently at 80 weeks from approved submittals which may be too long for the construction schedule. Approved submittals have been received and the switchboards are currently released. Eaton has the ability to build the switchboard at their specialty plant in Auburn Washington and the current lead time at that plant is 40 weeks from receipt of contract modification. This change order is to change manufacturing plants only. This is not an expediting option.

(*Id.*)

---

[2] In its Rule 11 brief, appellant included a statement of facts (app. br. at 3-8). The government did not dispute many of these facts (gov't reply br. at 1-11). The finding of facts citing to appellant's ASOF are undisputed or uncontroverted by the government.

On March 2, 2023, Jabez-Absher directed Danard to shift production of the "two switchgears" to the Auburn, Washington assembly line (R4, tab 72).[3]

III.     Project Coordination Meetings and Updates

Jabez-Absher and the USACE held weekly project coordination meetings. Following the government's approval of the switchboards, Jabez-Absher informed the USACE at the February 9, 2023, project coordination meeting that its supplier had indicated the lead times for the switchgear were "extraordinary long" (R4, tab 15 at 2284). The February 16, 2023, project coordination meeting minutes reflect that Jabez-Absher had placed an order for the switchgear with the supplier with a lead time of 85 weeks (R4, tab 16 at 2290). The meeting minutes also indicate "Other Suppliers – No Better Lead Times", "Temp Solutions – None available", "Other Factories – Increased Cost, No GUARENTEE" (*id.*). The minutes further listed potential impacts from the long switchgear lead time as: "8-10 Month Delay", "Project shutdown JAN 2024 until Switch Gear Arrive", "est BOD: MAR 2025", "est. CCD: JUL 2025", "$1 MIL to $1.5 MIL Cost" (*id.* at 2290-91). The February 23, 2023, meeting minutes reflect the same information as the previous week's minutes with respect to the switchgear except the cost of the switchgear delay is shown as "$0.5 MIL to $1.5 MIL Cost (Depending on Gov't Direction)" (R4, tab 17 at 2299). Likewise, the March 2, 2023, meeting minutes reflect the same information for the switchgear and do not mention Jabez-Absher's direction to Danard to change the production facility (R4, tab 18 at 2307).

On March 2, 2023, Jabez-Absher submitted an updated project schedule narrative report (R4, tab 66c). The schedule indicated the contract completion date shifted one calendar day due to the forecasted switchgear delivery on February 5, 2024 (*id.* at 3224). The report further stated Jabez-Absher was closely monitoring the lead times and delivery dates for the switchgear and discussions to reduce the 85-week switchgear lead time were underway (*id.* at 3225). A March 9, 2023, government quality assurance report daily construction log entry indicated the switchgear long lead time issue was discussed again, and "it was decided to have the contractor send a serial letter outlining the issues and way ahead" (R4, tab 70).

Finally, the March 16, 2023, meeting minutes indicate Jabez-Absher had taken action to mitigate the switchgear issue and that it will update the government once a new lead time is available (R4, tab 20 at 2318). The minutes further state there is a cost associated with this action (*id.*).

---

[3] The parties use the terms "switchgear" and "switchboard" interchangeably throughout the documents even though it appears the switchboard is part of the larger switchgear. The items that are the basis of the claim are the main switchboard (MSB) and the distribution panel-C (DP-C).

IV.    Request for Equitable Adjustment, Claim and COFD

On May 8, 2023, Jabez-Absher submitted a request for equitable adjustment (REA) in the amount of $100,865.76 for "costs incurred to avert a critical schedule impact due [to an] unforeseen supply chain issue" (R4, tab 21 at 2320).  Jabez-Absher indicated it proceeded with moving the production of the main switchboard and distribution panel-C to a different facility to meet the contract schedule even though this action resulted in increased labor costs (*id.*).  Jabez-Absher stated:

> The availability of this option required Jabez-Absher to take action before it was reasonably possible to conduct the standard added cost issue process.  Jabez-Absher made the decision in the best interest of the Government and proceeded at risk to direct Danard Electric Inc. and Eaton Corporation to, at an added cost, to move the production of the MSB and DP-C to the Auburn, WA manufacturing plant.

(*Id.* at 2320-21)

Jabez-Absher further stated the potential cost impact from the delay "was estimated to exceed $1,000,000 when accounting for the schedule extension and associated general condition costs" (*id.* at 2320).

On May 11, 2023, the government denied Jabez-Absher's REA.  The government's letter stated:

- Jabez-Absher was responsible for the on-time delivery of materials and equipment.

- The government was amenable to a no-cost time extension provided Jabez-Absher exercised good faith in mitigating any delay, the delay was due to COVID-19, and the delay impacted the contract completion date.

- The government never directed Jabez-Absher to use a specific manufacturer.

- The government was not notified of a request to change the manufacturer or the cost impact of such a change.

5

- Jabez-Absher made the decision to use an alternative switchgear facility at its own risk.

(R4, tab 26 at 2342)

On July 12, 2023, Jabez-Absher submitted a claim for the additional costs associated with changing the manufacturing facility (R4, tab 27). In its claim, Jabez-Absher indicated it chose to change the manufacturing facility for a shorter lead time to save additional general conditions costs (*id.* at 2344). Moreover, Jabez-Absher claimed it made the government aware of this issue and the associated cost impact during the weekly project coordination meetings (*id.*). Finally, Jabez-Absher asserted no alternative manufacturer was available that could meet the project schedule (*id.* at 2344-45). The government denied the claim by a final decision issued on February 8, 2024 (R4, tab 2). On May 8, 2024, Jabez-Asher timely appealed the denial to the Board.

DECISION

I. Legal Standard

Pursuant to Board Rule 11(a), the parties have waived a hearing and submitted the matter for decision on the record. The Board will weigh the evidence and make findings of fact, including on disputed facts. *See* Board Rule 11(a), (d); *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13). Jabez-Absher as the proponent of the claim for additional costs bears the burden of proof. *D-STAR Engineering Corp.*, ASBCA Nos. 62075, 62780, 25-1 BCA ¶ 38,816 at 188,827. Jabez-Absher retains this burden of proof under the Rule 11 process. *Peraton, Inc.*, ASBCA No. 62853, 25-1 BCA ¶ 38,856 at 189,062.

II. Government Did Not Order or Direct a Change

Appellant first contends that the government changed the contract when it concurred with Jabez-Absher's decision to change the manufacturing facility and requested appellant submit a serial letter describing the issue (app. br. at 8-9). The government responds that it never directed Jabez-Absher to make the change (gov't br. at 8).

The contract contains the standard FAR changes clause that gives the contracting officer the unilateral right to order changes in the contract work during performance. FAR 52.243-4(b), CHANGES (JUN 2007). In its response to the government's interrogatories, appellant admits no one in the government gave it a

6

written or oral order directing it to change the production facility (R4, tab 74 at 3248). *See Polote Corp.*, ASBCA No. 31115, 86-1 BCA ¶ 18,640 at 93,675 (government bound by admission in interrogatory response incorporated into the record). Rather, appellant in its equitable adjustment request indicated it "made the decision [to change the production facility] in the best interest of the Government and proceeded at risk to direct Danard Electric Inc. and Eaton Corporation to, at an added cost, to move the production of the MSB and DP-C to the Auburn, WA manufacturing plant" (R4, tab 21 at 2320-21). Appellant, and not the government, apparently made the decision to change the production facility because it thought making that change was a better alternative than enduring the more than $1,000,000 estimated cost impact resulting from a long project delay (*id.* at 2320).

Appellant contends that it notified the government of its decision to change the production facility, and the government concurred with the change at the weekly project coordination meetings (app. br. at 8-9). Appellant's contention, however, is not supported by the record. In its brief, appellant asserts government personnel were told at the February 16, 2023, weekly project coordination meeting that Jabez-Absher did not have to provide any further notification on the switchgear issue (app. br. at 9). The February 16, 2023, coordination meeting minutes, however, contain no such language. Appellant has presented no evidence that the government made the alleged statement at that meeting. Counsel's unsupported statements are not proof. *Zafer Constr. Co.*, ASBCA No. 56769, 17-1 BCA ¶ 36,776 at 179,231. The weekly project coordination meeting minutes instead indicate Jabez-Absher first informed the government of a change in the switchgear production facility on March 16, 2023, more than two weeks after Jabez-Absher had already ordered the change (R4, tab 20 at 2318).

Even if government personnel at the weekly project coordination meetings had approved Jabez-Absher's decision to change the manufacturing facility, appellant's decision to proceed with that unauthorized change would have been at its own risk. The contract specifically stated that only a warranted contracting officer had the authority to change the contract's terms and conditions (R4, tab 3 at 37). No evidence exists that a contracting officer attended those meetings.

Finally, appellant asserts it understood the government's direction to submit a "Serial Letter" was the first step in the formal change order process (app. br. at 9). Appellant appears to be referencing the government's March 9, 2023, quality assurance report daily construction log that indicates Jabez-Absher would submit a serial letter outlining the issues connected with the switchgear long lead time issue and the "way ahead" (R4, tab 70). The parties' agreement at a quality assurance meeting to have Jabez-Absher submit a letter describing the switchgear long lead time issue and proposing a path forward does not indicate a contracting officer's approval of a change to the contract.

7

Jabez-Absher has not established that the government directed or ordered a contract change.

### III. Government Did Not Constructively Change the Contract

Appellant next contends the government constructively changed the contract (app. br. at 10-11). To prevail on its constructive change argument, Jabez-Absher must show "(1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) (citing *The Redland Co. v. United States*, 97 Fed. Cl. 736, 755-56 (2011). Here, appellant fails on both grounds.

The contract required Jabez-Absher to supply all the materials necessary to perform the required work (R4, tab 3). The switchboards and distribution panels were a part of those required materials. Jabez-Absher's decision to change the production facility to meet the contract schedule did not change the contract requirements. Under this fixed-price contract, Jabez-Absher had the responsibility to assure itself before bidding that the specified equipment could be obtained on time to meet the contract's schedule. *See E.L. David Constr. Co.*, ASBCA No. 29224 *et al.*, 90-3 BCA ¶ 23,025 at 115,600. Absent an agreement to the contrary, Jabez-Absher was responsible for any price increases resulting from problems obtaining material from its chosen suppliers.[4] *Marvin D. Whitehead*, ASBCA No. 22598, 78-1 BCA ¶ 13,176 at 64,441 ("Under his fixed-price contract appellant assumed the obligation to perform the work for the stated amount.") Appellant has provided no evidence of such an agreement.

Jabez-Absher has also not established the government ordered either expressly or implicitly the production facility change. A contractor must show that the government required or compelled the contractor to perform the additional work not required by the contract to prevail on its constructive change claim. *David Boland, Inc.*, ASBCA No. 61923 *et al.*, 21-1 BCA ¶ 37,822 at 183,657. As previously discussed, appellant has pointed to no evidence indicating the government ordered, either expressly or impliedly, the change in the production facility. Rather, the evidence indicates Jabez-Absher directed this change before it notified the government

_____

[4] While Jabez-Absher may have been entitled to a time extension if the delay in obtaining the switchgear equipment was due to the COVID-19 pandemic, the Board has routinely rejected contractor claims for increased subcontractor and vendor costs on fixed-price contracts resulting from COVID-19. *See, e.g., BCI Construction USA, Inc.*, ASBCA No. 62657 *et al.*, 24-1 BCA ¶ 38,522 at 187,263.

of the change (R4, tab 20 at 2318). We conclude the government did not constructively change the contract.

IV. Constructive Acceleration Claim

In its brief, appellant suggests the government constructively accelerated its contract performance (app. br. at 9). Constructive acceleration occurs when the government demands compliance with an original contract deadline despite the existence of an excusable delay. *See Skanska USA Bldg., Inc.*, ASBCA No. 62430, 21-1 BCA ¶ 37,937 at 184,254-55. To prevail on a constructive acceleration claim a contractor must show that: (1) it encountered a delay that is excusable under the contract; (2) it made a timely and sufficient request for an extension of the contract schedule; (3) the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) the contractor was required to expend extra resources to compensate for the lost time and remain on schedule. *IAP Worldwide Servs., Inc.*, ASBCA No. 59397 *et al.*, 17-1 BCA ¶ 36,763 at 179,158. Appellant has failed to prove at least four of the five required elements.

Appellant has not alleged it was entitled to an excusable delay, that it made a request for a contract extension or that the government denied that request. Rather, the government in its response to Jabez-Absher's REA indicated it was amendable to a no-cost time extension if the electrical components delay was due to COVID-19, appellant took steps to mitigate the delay and the contract completion date was in fact impacted by this delay (R4, tab 26 at 2342). Appellant, however, never requested a time extension likely because it had already switched the production facility at the time it notified the government of the change. Moreover, appellant has not asserted the government insisted it complete the contract in a shorter time after considering any period of excusable delay due likely to the lack of any alleged acceleration order. Finally, while Jabez-Absher apparently chose to spend extra resources to change the production facility and remain on schedule, that decision appears to have been its own choice and not the result of any government direction.

Appellant has failed to prove a constructive acceleration claim.

V. Breach of the Duty of Cooperation, Good Faith and/or Fair Dealing

Appellant next asserts the government breached its duty of cooperation, good faith and fair dealing by failing to acknowledge the difficult project conditions and ignoring the material benefit the government received from appellant's actions (app.

9

br. at 11-12). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (internal citation omitted). The duty requires each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The duty, however, does not expand a party's contractual duties beyond those in the contract or create duties inconsistent with the contract's provisions. *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017).

Jabez-Absher argues the government breached the duty of good faith and fair dealing by denying its request for an equitable adjustment for the increased costs resulting from the change in the production facility required to avoid the financial and time impacts that existed with the original manufacturing facility (app. br. at 11). Appellant further asserts it notified the government of the change, and the government "directed and/or approved the actions taken by Appellant" *(id.* at 11-12).

The government awarded Jabez-Absher a fixed-price construction contract to repair certain military barracks at an agreed upon price. Pursuant to FAR 16.202-1, appellant's fixed-price contract is not subject to any adjustment to the contract price based upon the contractor's cost experience in performing the contract. *See Safaa Al-Rawaby Co.*, ASBCA No. 63146, 23-1 BCA ¶ 38,314 at 186,050 (citing *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014) ("The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs."); *Raytheon Missile Sys. Co.*, ASBCA No. 57594, 13-1 BCA ¶ 35,264 at 173,117 ("[T]he risk allocated to contractors by fixed-price-contracts of unexpected increases in the costs of material and labor is very broad indeed."). Jabez-Absher has produced no evidence that the government required it to select the original manufacturing facility or that the government was the cause of the production delay. Rather, Jabez-Absher faced a longer than expected lead time in the manufacture of the equipment, and, by its own admission, chose to move the production to a different facility at a higher cost instead of requesting a time extension. Whether the government was aware of that decision or benefitted from that decision is irrelevant to appellant's breach claim. The government's refusal to pay Jabez-Absher for its increased costs resulting from its decision to change the manufacturing facility cannot be said to have destroyed appellant's reasonable expectations that existed at the time it entered into this fixed-price contract thereby resulting in a breach of the duty of cooperation, good faith, and/or fair dealing. *See Lakeshore Eng'g Servs., Inc.*, 748 F.3d at 1349.

10

VI.  Unjust Enrichment and Quantum Meruit

Finally, appellant appears to assert an entitlement based upon unjust enrichment or quantum meruit contending the government was unjustly enriched due to appellant's decision to change the production facility (app. br. at 2).[5] The government correctly argues that the Board does not have jurisdiction to grant relief based on a claim of unjust enrichment since that claim is based on a contract "implied-in-law" (gov't reply br. at 18-19).  *See Cleveland Chair Co. v. United States*, 557 F.2d 244, 246 (Ct. Cl. 1977).  Under the CDA, the Board's jurisdiction extends only to express or implied-in-fact contracts and not to contracts implied-in-law.  *The Pub. Warehousing Co.,* ASBCA No. 56022, 11-2 BCA ¶ 34,788 at 171,227.

Similarly, the Board generally does not have jurisdiction to grant relief to a party under a quantum meruit basis of recovery since that also is an action on a contract implied-in-law.  *Supreme Foodservice GmbH*, ASBCA No. 58958 *et al.*, 24-1 BCA ¶ 38,470 at 186,994.  An exception to that general rule exists when the government seeks to avoid payment on the grounds that the contract is illegal or void ab initio (*id.*).  No such exception applies in this case.

CONCLUSION

For these reasons, appellant's appeal is denied.

Dated:  October 2, 2025

ARTHUR M. TAYLOR
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[5] Appellant's brief is unclear as to whether it asserts these theories as an entitlement claim or as a measure of its damages (app. br. at 2).  Since we find no entitlement, we do not need to address appellant's quantum claim.

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63898, Appeal of Jabez-Absher Small Business Joint Venture, rendered in conformance with the Board's Charter.

Dated: October 2, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

12