ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| ACC Construction Co., Inc. | )     ASBCA Nos. 62265, 62937 |
| | ) |
| Under Contract No. W912QR-17-C-0021 | ) |

APPEARANCES FOR THE APPELLANT:     Lochlin B. Samples, Esq.
     Mackenzie P. Bell, Esq.
       Smith, Currie & Hancock LLP
       Atlanta, GA

     Jacob W. Scott, Esq.
       Smith, Currie & Hancock LLP
       Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
       Engineer Chief Trial Attorney
     R. Lauren Horner, Esq.
     Brett R. Howard, Esq.
       Engineer Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE MELNICK

ACC Construction Company (ACC) seeks compensation under a construction contract with the United States Army Corps of Engineers ("Corps" or "government") for the costs it incurred complying with stormwater permitting requirements imposed by the Commonwealth of Virginia. Because the contract placed responsibility upon ACC to obtain and comply with the necessary state permits, and ACC has failed to establish any other grounds to impose liability upon the government, the appeal is denied.

VIRGINIA REGULATORY SCHEME

We begin with a summary of the applicable state regulatory regime to inform our findings of fact.

With exceptions not relevant here, a builder cannot perform land-disturbing activities in Virginia until it submits a permit application to the appropriate state authorities for approval. The application is required to include a stormwater management plan. Among other things, that submittal's contents must include information on stormwater discharges, current and final site conditions, proposed stormwater

management facilities with their location and acres treated, hydrologic and hydraulic computations and calculations verifying compliance with water quality and quantity regulatory requirements, and a map depicting the topography with improvements. Various entities within Virginia act on plans, including, as was the case here, the Virginia Department of Environmental Quality (DEQ). The state authority shall act on an application within 60 days after it has determined the plan is complete. The authority shall act on an application that was previously disapproved within 45 days after it has been revised, resubmitted, and deemed complete. (App. supp. R4, tab 13 at 176; tr. 2/83) VA. CODE ANN. § 62.1-44.15:34(A) (West 2014); 9 VA. ADMIN. CODE §§ 25-870-10, 25-870-30, 25-870-55. Virginia imposes an additional permitting scheme for stormwater discharges associated with industrial activities. Industrial activities are specifically defined by Virginia. They require the acquisition of a Virginia Pollution Discharge Elimination System (VPDES) permit. 9 VA. ADMIN. CODE §§ 25-31-120.

Significantly, Virginia limits the total phosphorous load of a new development to be calculated using the Virginia Runoff Reduction Method (VRRM) or another equivalent methodology approved by the State Water Control Board. The VRRM Excel spreadsheet serves as DEQ's compliance tool for projects subject to the VRRM. 9 VA. ADMIN. CODE §§ 25-870-63, 25-870-65; DEP'T OF ENVTL. QUALITY WATER PERMITTING DIV., GUIDANCE MEMO NO. 16-2001-UPDATED VIRGINIA RUNOFF REDUCTION METHOD COMPLIANCE SPREADSHEETS-VERSION 3.0 (May 2, 2016), https://swbmp.vwrrc.vt.edu/vrrm. The Virginia Stormwater BMP Clearinghouse is a website containing approved Best Management Practices (BMPs) for post-construction use to meet Virginia's total phosphorous requirements. Virginia defines a BMP to mean "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices, including both structural and nonstructural practices, to prevent or reduce the pollution of surface waters and groundwater systems." 9 VA. ADMIN. CODE § 25-870-10. The BMP Clearinghouse provides various design specifications. VIRGINIA STORMWATER BMP CLEARINGHOUSE, https://swbmp.vwrrc.vt.edu (last visited Aug. 19, 2022); see also 9 VA. ADMIN. CODE § 25-870-65. There are Level 1 and Level 2 BMPs. Level 1 is a basic design and Level 2 is more enhanced and therefore leads to a higher credit for phosphorous removal. (R4, tab 30 at 1928; tr. 2/67)

Two of Virginia's approved BMP specifications are relevant here. They are Practice 8: Infiltration Practices (Specification No. 8) and Practice 9: Bioretention (including Urban Bioretention) (Specification No. 9). Though quite detailed, Specification No. 8 explains that "[i]nfiltration practices use temporary surface or underground storage to allow incoming stormwater runoff to exfiltrate into underlying soils." In its beginning, the specification says that "[t]o prevent possible groundwater contamination infiltration should not be used at sites designated as stormwater hotspots." (R4, tab 33 at 2004) In turn, the specification explains that "[s]tormwater hotspots are operations or activities that are known to produce higher concentrations of

2

stormwater pollutants and/or have a greater risk for spills, leaks or illicit discharges" (R4, tab 33 at 2023). The specification includes a list of potential hotspots on Table 8.10 (*id.* at 2024). Some of the items on the list are industrial activities requiring a VPDES permit. Among them are fleet storage areas. However, hotspots and industrial activities are not the same. So, other items on the hotspot list are not industrial, including parking lots with 40 or more spaces. Departing somewhat from its initial declaration prohibiting the use of any infiltration at hotspots, here the specification allows restricted infiltration for some items, such as parking lots exceeding 40 spaces, while completely prohibiting it for others, such as fleet storage areas. (*Id.* at 2023-24; tr. 1/190) The relevant state authority (in this case DEQ) ultimately determines whether a particular operation or activity is a hotspot after a design package is submitted to it (tr. 2/83, 3/194).

Specification No. 9 addresses bioretention, which directs storm runoff into shallow landscaped depressions containing a bed of filtering media. The runoff ponds and then filters through the bed. (R4, tab 30 at 1927) There are two kinds of bioretention. The more typical one is a Bioretention Filter where runoff is eventually filtered to an underdrain for return to the storm drain system. The second is called a Bioretention Basin. In places with low risk of groundwater contamination, underdrains are only installed beneath a portion of the filter bed, or eliminated altogether, increasing stormwater infiltration. (*Id.*) Importantly, runoff from hotspot uses should not be treated with infiltrating bioretention. Instead, "[a]n impermeable bottom liner and an underdrain system must be employed when bioretention is used to receive and treat hotspot runoff." (*Id.* at 1941-42)

FINDINGS OF FACT

I.      Contract Planning

1. Sometime in 2015, the 99th Regional Support Command, part of the United States Army Reserve, requested to relocate an equipment concentration site to Fort A.P. Hill, Virginia. Among other things, the facility would contain a vehicle maintenance facility and an outdoor organizational vehicle parking area. The suggested site was woods that had been newly identified as an industrial area on the base master plan. (App. supp. R4, tab 11 at 80, 89-90; tr. 3/27) Different areas of Fort A.P. Hill are designated for specific purposes, such as residential, training, firing ranges, industrial, etc. This ensures that something like a noisy firing range is not located in a housing area. (Tr. 3/33-34) An industrial area is where activities such as equipment maintenance are performed (tr. 3/33). However, that base designation for the purpose of facility siting is unrelated to Virginia's stormwater permitting requirements (R4, tab 44 at 3290, 3302). We find that the project was never determined by DEQ to be performing industrial activities for state permitting purposes. Fort A.P. Hill's Real Property Planning Board, made up of the base commander and

3

heads of various components, approved the siting during a July 21, 2015, meeting (app. supp. R4, tab 11 at 78, 80; tr. 3/27).

2. The government performed an Environmental Assessment for the project under the National Environmental Policy Act, which was reviewed by DEQ. DEQ included within its response the observation that federal agencies conducting regulated land-disturbing activities must, among other things, comply with the Virginia stormwater management laws and regulations. Among these provisions is the requirement that the contractor submit a stormwater management plan to DEQ for review and approval. (App. supp. R4, tab 13 at 176-77)

3. Consistent with its regulatory mandates, while developing the solicitation for the maintenance facility, the government contemplated there would be significant stormwater management requirements that would be the responsibility of the designer to address (R4, tab 37 at 2251; app. supp. R4, tab 10 at 71).[1] The government was aware that DEQ never approved initial permit submissions, could take 45 days to respond to subsequent submissions (as provided by VA. CODE ANN. § 62.1-44.15:34(A)), and would add new comments after each review (app. supp. R4, tab 1). Internal government discussions recognized that DEQ had recently revised its requirements and many projects were having compliance difficulties. Permitting could take up to three months. (App. supp. R4, tab 12 at 123) Accordingly, the government factored 90 extra days into the solicitation's period of performance and sought a demonstration from offerors of their experience complying with Virginia's requirements (R4, tab 41 at 2939; tr. 3/24).

---

[1] The United Facilities Criteria (UFC) system dictates criteria for design and construction applicable to all military departments and defense agencies and must be used for all Department of Defense (DOD) projects (R4, tab 37 at 2236). UFC 3-210-10, titled Low Impact Development (LID), addresses the changes to natural water flow and decreases to water quality from construction. It recognizes that the Energy Independence and Security Act (EISA) of 2007 established stormwater design requirements for federal agencies to develop facilities and dictates standards for DOD compliance. (*Id*. at 2237, 2241) LID seeks to restore pre-development infiltration rates at project sites through management practices (*id.* at 2241). UFC 3-210-10 provides various LID standards to be employed for the design and construction of DOD projects. In addition to the extensive direct requirements mandated by UFC 3-210-10 is a more indirect one relevant here, which is that a project must "[c]omply with applicable State and local requirements for stormwater management." It states that "[c]oordination of the design is the responsibility of the designer to insure that the criteria are met from both the regulatory and LID perspectives." (*Id.* at 2251)

II.     Contract Award

4.  On July 13, 2017, the U.S. Army Engineer District, Louisville, awarded the contract identified above to ACC for the design and construction of the previously approved equipment concentration site at Fort A.P. Hill.  The primary structures are a Tactical Equipment Maintenance Facility and General Purpose Warehouse.  Surrounding them is a 55,450 square yard (approximately 11 acres) military equipment parking area to store around 900 vehicles.  (R4, tab 4 at 44-47, 291, 299, tab 17 at 1826; tr. 3/8)  ACC was to design and construct all site features, including drainage facilities (R4, tab 4 at 297).  The fixed price contract was for $19,331,614 (excluding betterments) (R4, tab 4 at 44).

5.  Among the standard clauses incorporated in the contract were FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (R4, tab 4 at 168); FAR 52.236-7, PERMITS AND RESPONSIBILITIES (NOV 1991) (*id.* at 170); and FAR 52.243-4, CHANGES (JUN 2007) (*id.* at 177).

6.  In addition to the Permits and Responsibilities clause, multiple contract clauses specified that ACC was responsible for obtaining all necessary state and local permits for the project and that the development complied with all applicable state and federal regulations and codes (R4, tab 4 at 295, 300-02, 309, 311, 319, 323-24).[2]  This

---

[2] The contract contained the following language:

> Contractor shall provide all. . . permits. . . to design and construct the TEMF, General Purpose Warehouse and associated site improvements (R4, tab 4 at 295).

> The Contractor shall assure that the site development complies with all applicable local, State and Federal Regulations.  A list of known regulations is located in Part 2 of the Statement of Work.  Timely acquisition of the necessary design and construction related permits shall be the responsibility of the Contractor.  The Contractor, upon notice to proceed, shall immediately begin working on the permits so as not to delay completion of the project.  The Contractor shall prepare permits, associated drawings, public notices, and other related documentation as necessary to successfully meet permit approval status.  The Contractor shall pay for associated permit fees.  (R4, tab 4 at 300)

> [D]esign and construction of Army Reserve real property improvements shall also comply with all current and

applicable State and local codes, and with all other applicable laws and regulations governing development, design and construction at the site. If certain of such requirements appear particularly onerous, or hamper required functionality of the project, the Contractor may recommend the Government waive the requirement or implement a lesser requirement. The Government's acceptance of such recommendations is not assured. (R4, tab 4 at 301)

The following specifications, codes, standards, bulletins and handbooks form a part of this RFP. <u>The applicable editions are those current as of the date of this RFP</u>
. . .
State of Virginia
. . . .
State/Local Sedimentation and Erosion Control Design Requirements
State/Local Environmental Control Requirements
State/Local Storm Water Management Requirements
(R4, tab 4 at 302).

The Contractor is responsible for making all applications and obtaining required municipal, utility, and regulatory agency coordination, reviews, permits, inspections and approvals, and is responsible for payment of any associated fees or charges (R4, tab 4 at 309).

The Contractor is responsible for preparation and compliance with stormwater NPDES Permit, Stormwater Pollution Prevention Plan . . . requirements, and for any associated fees and permits (R4, tab 4 at 311).

Federal, State and local regulations regarding the design of stormwater management systems shall be considered the minimum design criteria (R4, tab 4 at 319).

The local drainage authority is: Fort AP Hill DPW.

      . . . .

Preliminary coordination with the local drainage authority indicated that the Contractor shall provide the following: In

included complying with Virginia stormwater management regulatory and permit requirements (R4, tab 4 at 302, 311, 319, 323-24). The contract also stated that "[t]he project site is located within the Chesapeake Bay Watershed which is considered impaired waters" (R4, tab 4 at 323). ACC was to integrate design and permitting activities, including conferences and follow-up actions, into the schedule. The schedule was to include review and correction periods associated with each item. (R4, tab 4 at 679) Though at a pre-award meeting the government discussed commenting for offerors that stormwater permitting from Virginia might be difficult, it did not issue such instructions. It was not the government's practice to evaluate other regulators or comment in solicitations about whether they are difficult or slow. (App. supp. R4, tab 12 at 123; tr. 3/89-90) However, the contract did contain a clause recognizing that some permits required up to 180 days to obtain (R4, tab 4 at 869). To comply with its obligation to timely obtain permits, ACC was to immediately begin working on them upon receipt of the notice to proceed (R4, tab 4 at 300).

III.     Mason & Hanger's Experience, Source Selection Board, No Government Pre-award Knowledge of a Hotspot

7. ACC's proposal designated Mason & Hanger as its design firm (R4, tab 6 at 1485). In response to the solicitation's requirement that offerors discuss their experience complying with Virginia's stormwater management standards, ACC represented that Mason & Hanger recently worked on projects at Fort A.P. Hill, and that its personnel were "very familiar with [the] installation, both from an architectural aspect as well as from a civil engineering aspect involving permitting, stormwater requirements, sediment and erosion control and utilities." ACC stressed that its "design team members have experience coordinating with Ft. A.P. Hill Environmental, Chesapeake Bay office and the Commonwealth of VA." (R4, tab 6 at 1501) We infer that the reference to Virginia includes DEQ. ACC and Mason & Hanger represented that Mason & Hanger had significant experience with stormwater permitting in

---

addition to the EISA drainage requirements, this project must also comply with Virginia DEQ Stormwater Management, Erosion and Sediment Control, and Construction General Permit requirements. The project is located within the Chesapeake Bay Watershed which is considered impaired waters. Also refer to Attachments 'J' and 'L' of this section for Virginia DEQ checklists. (R4, tab 4 at 323)

Obtain a copy of requirement or guidelines for drainage system construction from the State of Virginia. Meet the requirements and guidelines and obtain permits and pay fees (R4, tab 4 at 324).

7

Virginia and that its design would meet Virginia's requirements (R4, tab 6 at 1503; tr. 1/173). ACC relied upon Mason & Hanger's experience preparing its proposal (app. prop. finding ¶ 47). Mason & Hanger's stormwater system designer for the project, Mr. Geoffrey Lynn, was aware that it was difficult to get projects approved by all state environmental departments, including Virginia's DEQ (tr. 1/184-86, 226-27).

8. The Source Selection Board found ACC's proposal met the solicitation's requirements and that its design drawings were outstanding (tr. 3/86-87). There is no evidence the government knew the site was a hotspot under DEQ specifications at the time of award.

IV. Notice to Proceed and Permit Application Schedule

9. On August 1, 2017, the government issued the notice to proceed, requiring commencement of work within 10 days and completion by August 24, 2019 (R4, tab 8). ACC's preliminary schedule from that date showed it would submit a Stormwater Pollution Prevention Plan (SWPPP) to DEQ by October 6, 2017 (app. supp. R4, tab 24). An SWPPP, which is required by the contract, is contemplated under Virginia law to identify sources of pollution that may affect the quality of stormwater discharges. It encompasses both the construction phase and post-construction so, among other things, it includes or incorporates the stormwater management plan. (R4, tab 4 at 874; tr. 1/187-88, 3/112) 9 VA. ADMIN. CODE §§ 25-870-10, 25-870-54. A different kind of SWPPP is required in Virginia for industrial activities (R4, tab 33 at 2023; tr. 1/192-93). 9 VA. ADMIN. CODE § 25-151-80. ACC anticipated DEQ would require nearly three months, until January 4, 2018, to review its initial SWPPP. ACC also built in another two months for DEQ to review a subsequent resubmittal of the SWPPP. It did not expect to receive a permit until March 9, 2018, 154 days after initial SWPPP submission, or for approximately five months. (App. supp. R4, tab 24) The next month the schedule had slipped with ACC expecting to receive a permit by March 27, 2018, after two DEQ reviews (app. supp. R4, tab 17 at 248).

V. Preconstruction Meeting

10. Notwithstanding ACC's assurances that Mason & Hanger was familiar with DEQ, during the August 15, 2017, preconstruction meeting, the government emphasized as a major topic of discussion the challenges of obtaining DEQ's approvals, including the likely need for multiple submittals (app. supp. R4, tab 5; tr. 1/ 165, 3/107-09; app. prop. finding ¶ 62; gov't prop. finding ¶ 27). ACC reiterated that Mason & Hanger was experienced and understood the challenges (tr. 3/108-09).

8

## VI.    Fisher Discussion and Standard SWPPP

11.    On August 17, 2017, Mr. Lynn, Mason & Hanger's designer, requested Mr. George Fisher, an environmental specialist at Fort A.P. Hill, to provide him with an example of an SWPPP (app. supp. R4, tab 39 at 1209; tr. 3/111).  Mr. Fisher responded that Mr. Lynn should generate his own based upon this project's requirements.  Nevertheless, expressing only his own personal thoughts and not an official communication from the Corps, he proceeded to provide a list of references that could be reviewed and items that should be included.  He incorrectly characterized the site as industrial so care should be taken selecting BMPs to meet water quality requirements.  (App. supp. R4, tab 39 at 1208-09)  Mr. Lynn was not influenced by that statement because he did not proceed to analyze the project for industrial permitting (tr. 1/188-90).  He submitted a standard SWPPP to DEQ, not an industrial one (tr. 1/192-93).  Neither the government nor DEQ objected.

## VII.    Mason & Hanger Design

12.    The large parking lot Mason & Hanger designed for military vehicles was composed of aggregate which, if left alone, would cause a significant amount of rain runoff.  To address this, Mason & Hanger contemplated a stormwater management system that would infiltrate rain into the ground to mimic preconstruction conditions.  (R4, tab 6 at 1503, tab 17; tr. 1/191, 206)  Under the plan, the finished site would drain the aggregate parking lot, the building roofs, and other hard surfaces outside the buildings using a combination of dry swales and a bioretention basin to control runoff (R4, tab 6 at 1491, tab 17; tr. 1/198-201).[3]

## VIII.    Hotspot Discussion

13.    On January 30, 2018, the parties held a meeting about Mason & Hanger's December 2017 draft design (R4, tab 62; tr. 3/117).  At that time, the draft was still conceptual and therefore not sufficient for submission (R4, tab 62 at 3784; tr. 2/14).  One of the government's contract employee design reviewers was Mr. Brian (Scutter) Lee (tr. 3/125).  Mr. Lee holds a certificate from DEQ in erosion sediment control and stormwater management.  He provides environmental consulting services to Fort A.P. Hill, reviewing stormwater designs, and providing recommendations to project designers and government staff.  (Tr. 3/174-76)  However, his comments were not mandatory upon Mason & Hanger, he had no contractual authority over it or ACC, or any regulatory authority to act for DEQ (tr. 3/125, 177, 183-84).

---

[3] A dry swale is essentially a ditch with materials at the bottom that store and clean the water as it flows through it (tr. 1/198-99).

9

14. During the January 30 meeting, Mr. Lee shared 19 comments about the draft design. Given his comments, the parties agreed to hold weekly conferences and Mason & Hanger requested that the fast track for its design be delayed until February 22, 2018. (R4, tab 62 at 3784) After the meeting, Mr. Lee and Mr. Lynn discussed the site's status as a hotspot and the associated stormwater management requirements (tr. 1/225-27). This is the first indication of a hotspot identification. It was only upon his January review of the draft submittal that Mr. Lee realized the site was potentially a hotspot (tr. 3/184-85, 187-88).

15. ACC, Mason & Hanger, and the government maintained a running electronic commentary about the project called DRChecks (R4, tab 11; tr. 3/117-18, 177-79). The next day, on January 31, 2018, Mr. Lee added comments. Among them was that DEQ's bioretention design specifications required that "bioretention BMPs installed within hotspot land uses must use an underdrain with an impermeable liner" (R4, tab 11 at 1616). Though not required to agree with comments made in DRChecks, Mr. Lynn expressly "concurred" with Mr. Lee's statement on February 6, adding that "[u]nderdrains will remain and an impermeable bottom liner will be added" (R4, tab 11 at 1616; tr. 2/14-15). Mr. Lynn understood that if a facility is listed in Table 8.10 of Specification No. 8 it is almost certainly a hotspot (tr. 1/195-96). A February 14, 2018, email from Mr. Lynn to Mr. Mike Spradling, also of Mason & Hanger, recognized that the project was a hotspot within the Chesapeake Bay watershed that would be subject to specific DEQ requirements (R4, tab 31 at 1990).

IX.     First Submission to DEQ

16. On March 22, 2018, DEQ received Mason & Hanger's Erosion Soil Control and Stormwater Management plans, dated March 8 (R4, tab 13). The government had forwarded them to DEQ for ACC, which was typical, believing it would expedite processing (app. supp. R4, tab 17 at 238; tr. 3/137-38). On May 8, 2018, DEQ responded with 14 comments indicating inadequacies. Generally, the submission lacked basic materials such as an electronic copy of the VRRM spreadsheet, elevations and contours, the registration statement required to commence the process, and contact information. The stormwater management plan did not clearly show the necessary features and analysis to assess water quantity as well as channel and flood protection. It also failed to present adequate drainage calculations, lacked documentation demonstrating required channel and flood protection, and detailed design plans showing compliance with DEQ BMP specifications. DEQ stated that its comments had to be addressed before it could continue reviewing the plans and its response was not a final determination. (R4, tab 13)

10

X.     Second and Third Submissions to DEQ, Mr. Cooper's Conclusions, and
       Call With DEQ

17.  On June 19, 2018, DEQ responded to another Mason & Hanger submission dated May 17.  This response contained 17 comments.  Included among those was the observation that the VRRM spreadsheet did not show the BMPs removing sufficient nutrients.  Again, all the comments had to be addressed before DEQ could continue with the review and approval process.  (R4, tab 15)

18.  The VRRM spreadsheet issue raised by DEQ's second response came up again in a July 3, 2018, conference call between Mason & Hanger, ACC, Ft. A.P. Hill personnel, and Margaret Dannemann and April Rhodes of DEQ.  Mason & Hanger complained that the spreadsheet dictated a 95% runoff rate from the equipment parking area.  Because the area was composed of aggregate, Mason & Hanger thought the rate should be 85%.  The 95% rate led to a higher calculated nutrient discharge than could be handled by the Mason & Hanger design.  Ms. Dannemann recommended that Mason & Hanger consult with Mr. Robert Cooper of DEQ, who she identified as her boss.  (App. supp. R4, tab 46)  Mr. Cooper is a licensed professional engineer in Virginia and a BMP specialist at DEQ.  He advises DEQ reviewers, project engineers, designers, contractors, and the public.  (Tr. 2/64-65, 84-85)  *Virginia Runoff Reduction Method*, VIRGINIA STORMWATER BMP CLEARINGHOUSE, https://swbmp.vwrrc.vt.edu/vrrm (last visited Aug. 19, 2022) (identifying Mr. Cooper on the Virginia Stormwater BMP Clearinghouse webpage as a point of contact for the public).  On July 6, 2018, Mason & Hanger sent a third submission to DEQ, this time with assistance from Mr. Cooper (R4, tabs 66-67; app. supp. R4, tab 46).

19.  When Mr. Cooper became involved with the project, he formed the opinion that, consistent with Table 8.10 of Specification No. 8, the project was a hotspot because, among other things, the vehicle storage lot was a parking lot that would hold more than 40 vehicles (R4, tab 33 at 2024, tr. 2/73-77).  He shared his hotspot determination with ACC in a conference call held July 6, 2018.  During that call he also explained that the use of the impermeable liner required for a hotspot precludes treating the BMP as supporting Level 2 nutrient removal.  (R4, tab 23 at 1856; tr. 1/241)

20.  On August 7, 2018, Ms. Dannemann invited ACC to participate in another conference call to discuss its latest submission to DEQ (R4, tab 32 at 2001-02; tr. 3/151).  In addition to Ms. Dannemann, the August 8 call included Mr. Cooper, Mr. Mathew McKnight (Vice President of ACC), Mr. Michael Higgins (the government project manager), Mr. Cory Pugh (the Contracting Officer's Representative), and Mr. Fisher (R4, tab 32 at 2000; tr. 2/71, 3/40).  The call addressed whether Mason & Hanger's July submission had addressed DEQ's prior 17 comments, as well as the site's status as a

hotspot (tr. 2/71, 3/41-42, 151-52). Mr. Higgins expressed an interest in providing materials that would change the hotspot designation (tr. 3/41-43).

XI.    Mr. Higgins and Memos to DEQ

21.    After the August 8 call concluded, Ms. Dannemann emailed the participants a copy of Specification No. 8 (R4, tab 32 at 2000, tab 33; tr. 3/43). Though this was his first experience with DEQ, and he denies knowing what a hotspot is, Mr. Higgins responded to that email, copying ACC and Mason & Hanger, asking Ms. Dannemann to review the matter with the DEQ central office to ascertain if the site could be considered a non-hotspot. Mr. Higgins inaccurately based his contention that it was not a hotspot upon his opinion that the facility should be considered a fleet storage area (which in fact are industrial hotspots under Specification No. 8), that oil drip pans would be placed beneath parked vehicles, and the vehicle maintenance facility was contained and would use oil/water separators. (R4, tab 32 at 1999-2000, tab 33 at 2023-24; tr. 3/39, 46, 87) Mr. Higgins had no authority himself to classify the site (tr. 3/46-47). There is no evidence that ACC or Mason & Hanger commented themselves on Mr. Higgins' statement.

22.    Following his email to Ms. Dannemann, Mr. Higgins wrote a memo for DEQ providing information intended to avoid a hotspot designation (app. supp. R4, tab 15, tab 17 at 1825; tr. 3/47-48). He forwarded the memo to ACC for inclusion with its own submission (tr. 3/48-49). The result was a memo dated August 14, 2018, from Mason & Hanger to Mr. Cooper at DEQ describing the project, including the aggregate military equipment parking area (R4, tab 17). The attached memo from Mr. Higgins addressed the site's purpose and explained that the stored equipment would be examined for leaks regularly and addressed immediately. It also described Ft. A.P. Hill's spill response policies, plans, and prevention procedures. It attached relevant internal guidance and a spill response regulation. It did not say the site is an industrial fleet storage area. (R4, tab 17 at 1825-26).

XII.    DEQ's Hotspot Determination

23.    On August 17, 2018, Ms. Dannemann of DEQ emailed Mason & Hanger, ACC, and the government thanking them for their memo and stating that "[a]fter review and discussion of the memo we have concluded that the proposed procedures, while helpful, are not enough to ensure that there will be no negative effects on ground water as a result of the hot spot activities on the site." Ms. Dannemann did not say why DEQ considered the site a hotspot. (R4, tab 19) Because fleet storage areas are among the industrial hot spot activities listed in Table 8.10 of Specification No. 8, had DEQ agreed with Mr. Higgins that the site was an industrial fleet storage area, ACC would have been required to submit an industrial VPDES permit application accompanied by an industrial SWPPP (R4, tab 33 at 2023-24). 9 Va. Admin. Code

§§ 25-31-120, 25-151-80. Given that DEQ did not require those submissions, we infer that it was not convinced by Mr. Higgins' suggestion that the site was a fleet storage area. Instead, we find that it followed Mr. Cooper's prior determination that the site was a hotspot because it included a parking lot containing more than 40 spaces, which is one of the non-industrial hotspots listed on Table 8.10 of Specification No. 8. ACC's May 14, 2019, claim to the contracting officer also acknowledged that DEQ deemed the site a non-industrial hotspot (R4, tab 3 at 19).

XIII.   DEQ's Level 1 Determination and Jellyfish Filters

24.  With it firmly established by DEQ that the site was a hotspot requiring an impermeable liner and underdrain, DEQ persisted with its position that the design's bioretention basins could not be considered Level 2 BMPs providing enhanced nutrient removal. Under Specification No. 9, Level 2 basins reduce runoff far more than Level 1. Much of the reason for that is that runoff infiltrates into the ground. (R4, tab 30 at 1928; tr. 2/68-69, 80-82) DEQ concluded that a liner blocking infiltration reduces the runoff reduction taking place in the basin to the point that it does not meet the Level 2 standard (app. supp. R4, tab 54; tr. 2/79-82). DEQ did not cite any published material to support its conclusion (tr. 1/242-43, 2/82). At the time of the hearing, it was in the process of revising Specification No. 9 to make the point explicitly in its regulations (tr. 2/82-83).

25.  DEQ's ruling that a bioretention basin incorporating an impermeable liner was not a Level 2 BMP forced Mason & Hanger to include another pollution treatment mechanism to achieve the required nutrient removal levels. It added two Contech Jellyfish Filters which are structures that provide membrane filtration of pollutants. (R4, tab 68; app. supp. R4, tab 67 at 6229, 6239; tr. 1/110, 238-240, 244)

XIV.   Correspondence, REAs, Fourth, Fifth, and Sixth Submissions to DEQ, DEQ's Approval

26.  By letter dated August 21, 2018, ACC notified the government that DEQ had delayed addressing ACC's July submission, which it characterized as an excusable delay. ACC also expressed "concerns" with the site's designation as a hotspot, complaining that the government's solicitation had not identified it as one. Compliance would require a costly redesign. ACC notified the government that it would submit a Request for Equitable Adjustment (REA) for the delay and redesign costs. (App. supp. R4, tab 48 at 1640) The government responded on August 24, 2018, that ACC was obligated under the contract to design the project in compliance with DEQ requirements, that DEQ concluded the site was a hotspot, and DEQ had provided its comments within the 45-day review period (R4, tab 21).

27.  On August 22, 2018, ACC made a fourth submission to DEQ that DEQ found acceptable (app. supp. R4, tab 50 at 1656). A fifth submission required by DEQ

13

to consolidate materials, received on September 6, 2018, included the Contech Jellyfish Filters (R4, tabs 68, 70; app. supp. R4, tab 50 at 1656, tab 51 at 1786, 1834). DEQ then required a sixth submission to correct two items unrelated to this matter, which it received from ACC on September 14, 2018. On September 19, 2018, DEQ approved ACC's stormwater management plan, 181 days after it had received the initial submission on March 22. (R4, tabs 13, 22, 71) DEQ's approval took 27 days (less than a month) more than the 154 days ACC had originally estimated (app. supp. R4, tab 24).

28. In a letter to the government dated October 12, 2018, ACC repeated its observation that the solicitation did not identify a hotspot. It then explained why it believed the site was not a hotspot or should be considered at Level 1. It acknowledged that the government had unsuccessfully attempted to change DEQ's hotspot designation. It concluded that DEQ's actions required it to add Jellyfish Filters and make other changes to its design. It did not suggest that the government had imposed an industrial designation upon the project or influenced DEQ when Mr. Higgins opined that it might be a fleet storage area. Nevertheless, it reserved its right to pursue an REA with the government and expressed a hope that the government would "reach out to the State of Virginia to avoid these unnecessary additional cost impacts." (R4, tab 23) The contracting officer's November 19, 2018, response noted that ACC's proposal had touted Mason & Hanger's familiarity with DEQ's requirements. Compliance was ACC's responsibility and not a change to the contract. (R4, tab 24) In another letter dated January 7, 2019, ACC contended that the government should have ascertained that the site was a hotspot limited to Level 1 removal prior to issuing the solicitation. It maintained that Mason & Hanger's original Level 2 non-hotspot design met the solicitation's terms and therefore sought the government to waive Virginia's requirements as "onerous." Alternatively, it expected $1,412,744 in compensation from the government. ACC also sought $506,809 for delays it alleged resulted from "the six months it took to receive VA DEQ approval." The letter stated that it attached REAs for those amounts. (R4, tab 25) In addition to reiterating that the contract required ACC to comply with DEQ specifications, the contracting officer's February 1, 2019, denial of the REAs also explained that DEQ's requirements cannot be waived under the Clean Water Act. ACC's struggles to comply with them were not the fault of the government. (R4, tab 26)

XV. Certified Claims

29. On May 14, 2019, ACC submitted a certified claim to the contracting officer for $2,811,944.86 and a 278 day time extension. Included in this amount was $1,412,744 in "costs arising from [the government's] insistence that ACC comply with the undisclosed requirements of [DEQ] that determined the area was a non-industrial hotspot." The remaining $1,399,200.86 was for delays to the project allegedly arising from DEQ's hotspot determination, as well as resulting inefficiencies caused by the

14

project's delay into a period of unfavorable weather. ACC argued entitlement based upon alleged defective specifications, constructive change, and weather delay. (R4, tab 3) The contracting officer denied this claim on October 31, 2019, and ACC's appeal was docketed as ASBCA No. 62265 (R4, tab 2). ACC then submitted a second claim to the contracting officer on February 12, 2021, asserting superior knowledge as an additional ground for recovery and increasing the amount sought by $64,473.73 (R4, tab 42). That was denied on May 14, 2021, and ACC's appeal was docketed as ASBCA No. 62937 (R4, tab 44). The appeals have been consolidated.

<u>DECISION</u>

ACC claims entitlement to compensation under various theories that we consider separately.

I.      Constructive Change

ACC suggests that the contract established the site as non-industrial and a non-hotspot under DEQ standards. It says that shortly after award the government declared it a hotspot in contradiction to the contract. ACC also contends that the government's August 2018 memorandum to DEQ informed ACC that the site was a fleet storage area "requiring the strictest Level 1 removal factors and necessitating a redesign of the stormwater system." It alleges that DEQ "adopted [the government's] directive and determined that ACC could not continue to use Level 2 removal factors with an impermeable liner." ACC states that the contracting officer's February 1, 2019, denial of ACC's REAs "directed ACC to comply with DEQ's determination that the site was a fleet storage area, thereby requiring ACC to revise its design yet again to add expensive jellyfish filters that ACC had not anticipated in its proposal." It argues the government's fleet storage determination, combined with its direction to comply with this new requirement, constitutes a constructive change to the contract.

"[T]he contracting officer may . . . *constructively* change the contract, 'either due to an informal order from, or through the fault of, the government." *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016) (quoting *Nav Com Def. Elecs., Inc. v. England*, 53 Fed. App'x 897, 900 (Fed. Cir. 2002)) (emphasis in original); *Kellogg Brown & Root Servs., Inc.* ASBCA Nos. 59385, 59744, 20-1 BCA ¶ 37,656 at 182,829. Generally, when the government requires a constructive change, it must fairly compensate the contractor for the costs. *Kiewit Infrastructure West Co. v. United States*, 972 F.3d 1322, 1329 (Fed. Cir. 2020). To prevail, the contractor must "show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014); *Kellogg Brown & Root Servs.*, 20-1 BCA ¶ 37,656 at 182,829.

15

ACC's description of the contract and events bears no resemblance to our findings. First, ACC's initial suggestion that the government made contractual commitments to ACC that the site was a non-hotspot under DEQ specifications is plainly wrong. The contract could not have been clearer that ACC was solely responsible for ascertaining and complying with the state's requirements and for obtaining all necessary state and local permits for the project, whatever they might be. The contract's Permits and Responsibilities clause states in relevant part that:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

FAR 52.236-7 (finding 5). But that is not all the contract says. It contains several other pronouncements solidifying the allocation to ACC of the costs associated with meeting state permitting standards. Thus, it repeated that ACC was to provide all permits to design and construct the structures and associated improvements. It was to assure that the site development complied with all local and state regulations. It was responsible for timely acquisition of the necessary design and construction related permits. It had to prepare permits and other related documentation as necessary to successfully meet permit approval status. Its design was to comply with all current and applicable state codes, laws, and regulations governing development, design, and construction at the site. The specifications and codes of Virginia, including stormwater management requirements, formed a part of the contract. Its duties specifically included complying with Virginia DEQ Stormwater Management requirements. It was to obtain a copy of the state's requirements or guidelines for drainage system construction and meet them. (Finding 6) Together, these provisions demonstrate the contract unequivocally assigns all risk for complying with permitting requirements upon ACC. *See Bell/Heery*, 739 F.3d at 1334.

Against the backdrop of the voluminous contractual language imposing sole responsibility for state regulatory compliance upon ACC is the absence of any advisement or commitment by the government that in pursuing permitting with DEQ ACC could expect the site not to be a hotspot. It was entirely for ACC to determine what DEQ required. Moreover, ACC's proposal stressed to the government Mason & Hanger's recent experience working on such projects at Fort A.P Hill, the familiarity of Mason & Hanger's personnel with permitting and stormwater requirements, as well as coordinating with appropriate local authorities, including DEQ (finding 7). The fact that upon award the government found ACC's initial plan acceptable for its own purposes (finding 8) was not a warranty Virginia would find it in compliance with its regulatory mandates. Unless the government assumed that risk in unmistakable terms it is not liable for the third party determinations of another sovereign government. *See*

16

*Kellogg Brown & Root Servs.*, 20-1 BCA ¶ 37,656 at 182,826 (citing *Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002)); *see also Zafer Taahhut Insaat ve Ticaret A.S.*, 833 F.3d at 1364 (holding the government is not responsible for the sovereign acts of a foreign nation). Because the contract squarely places upon ACC responsibility for navigating Virginia's stormwater regulatory regime, the government was justified in relying upon it to successfully accomplish that task.

Second, we have not found that shortly after award the government dictated to ACC that the site was a hotspot requiring redesign. Nobody associated with the government is known to have considered the matter at all until more than six months after award when, while providing comments about Mason & Hanger's incomplete conceptual stormwater management design, Mr. Lee, Ft. A.P. Hill's DEQ certified reviewer in stormwater management, suggested the site was a hotspot under the DEQ specifications. Accordingly, he advised that bioretention basins should use underdrains and impermeable liners. Mr. Lee lacked any contractual authority for the government, or authority to act for DEQ, and his comments were not mandatory upon ACC or Mason & Hanger. Far from treating the observation as a directed contractual change, Mr. Lynn, Mason & Hanger's designer, expressly concurred with Mr. Lee's conclusion without any indication of disagreement from either him or anyone else associated with ACC. Indeed, a subsequent Mason & Hanger internal communication recognized that the site was a hotspot within the Chesapeake Bay watershed. Mr. Lynn responded to Mr. Lee by voluntarily adding underdrains and an impermeable liner to the design. (Findings 13-15)

Third, Mr. Lee's and Mason & Hanger's beliefs turned out to be warranted because DEQ ultimately ruled itself that the site was a hotspot under Virginia's stormwater specifications (findings 19-20, 23). Instead of masterminding an effort to saddle ACC with the stricter requirements associated with that determination, as ACC contends, the government project manager, Mr. Higgins, tried to change DEQ's mind so that ACC would be relieved of the consequential burdens (findings 20-22). ACC's suggestion that Mr. Higgins' August 2018 memorandum (which ACC voluntarily forwarded to DEQ) informed ACC that the site was a fleet storage area "requiring the strictest Level 1 removal factors" is inaccurate (finding 22). Also unfounded is ACC's allegation that the government "directed" DEQ to treat the site as an industrial fleet storage area, requiring ACC to abandon its Level 2 treatment design. The government did not direct DEQ to do anything, nor are we aware that it had the power to do so. Although Mr. Higgins incorrectly suggested to DEQ in an email that the site was a fleet storage area out of a misguided belief that would mean it was not a hotspot, he had no authority to require that conclusion. Nor did ACC or Mason & Hanger object. (Finding 21) Moreover, DEQ did not adopt that proposal. DEQ never instructed ACC or Mason & Hanger to treat the site as an industrial fleet storage area. Instead, as ACC

17

has previously acknowledged, DEQ concluded that the site was a non-industrial hotspot. (Findings 1, 23)

DEQ's further instruction to Mason & Hanger that the impermeable liner required underneath a bioretention structure treating hotspot runoff forecloses Level 2 nutrient removal, mandating that it be treated as Level 1, was entirely the regulatory determination of DEQ (findings 19, 24). The government had nothing to do with it. In fact, there is no evidence that either the government or ACC believed that would be the requirement until DEQ imposed it. DEQ's instruction became a condition to its approval of Mason & Hanger's stormwater management plan that ACC was required to obtain under the contract. The government's February 1, 2019, letter did not direct ACC to perform any additional work beyond what the contract required; it simply denied ACC's REAs (finding 28). The government is not responsible for DEQ's regulatory demands, so it is not at fault for a change in ACC's performance costs arising from them. *See Bell/Heery,* 739 F.3d at 1333-35 (holding the Permits and Responsibilities clause assigns all risk for complying with local permitting requirements upon the contractor and the government is not responsible for a change when a state government compelled a modification to the contractor's planned operations); *Kellogg Brown & Root Servs.*, 20-1 BCA ¶ 37,656 at 182,829 (finding the government is not at fault for a change based upon the demands of another government) (citing *Zafer Taahhut Insaat ve Ticaret A.S.*, 833 F.3d at 1364).[4] Accordingly, we find ACC's contention that the government constructively changed the contract is without merit.

---

[4] ACC has not persuaded us to apply *Norair Engineering Corp.*, GSBCA No. 1760, 66-1 BCA ¶ 5440. That non-binding ruling of another board finds that working hour restrictions imposed by a District of Columbia government construction permit constitutes a compensable change by the Federal Government to a contract containing the Permits and Responsibilities clause because the government did not ascertain the District's permitting criteria and alert bidders about it before award. The holding is inconsistent with the clause and the binding precedents we have cited. Another case cited by ACC, *Odebrecht Contractors of California,* ENGBCA No. 6372, 00-2 BCA ¶ 30,999, is distinguishable. There, another board found the government responsible for a change when, after warranting the availability of certain wells for contract performance, it orchestrated harsh local permitting restrictions to avoid the consequences of the contract. *Id.* at 153,073-074. Here, the government did not warrant specific regulatory treatment by DEQ and then cause it to do the opposite.

II.     Defective Specifications

Another theory of recovery advanced by ACC is that the government breached the implied warranty of specifications described in *United States v. Spearin*, 248 U.S. 132 (1918).  Under that doctrine, when the contractor is required to follow design specifications provided in the contract, an implied warranty arises that the work will not be defective or unsafe.  *Lakeshore Eng. Servs., Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014) (citing *Essex Electro Eng'rs v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000)).  Should the design specifications be defective, the contractor is entitled to recover the resulting proximate costs.  *Essex Electro Eng'rs*, 224 F.3d at 1289.  This does not alter the general rule that a contractor committing to build something for a fixed price retains the risk of cost increases from unforeseen difficulties not caused by new actions of the other party.  *Lakeshore Eng. Servs.*, 748 F.3d at 1349 (citing *Spearin*, 248 U.S. at 136).

ACC says the solicitation did not identify the project as a hotspot or industrial site or restrict offerors from using "Level 2 nutrient removal factors."  It notes the Corps coordinated prior to award with Fort A.P. Hill and they made no determination that the project was an industrial site or a hotspot.  It observes that none of the environmental studies identified it as a hotspot or gave any other reason why the site would only permit "Level 1 removal factors."  ACC suggests it relied upon the solicitation to propose a design that it considered to meet Level 2 removal.  It alleges the government subsequently declared the site industrial and a hotspot, requiring design revisions, "particularly once DEQ adopted [the government's] previously undisclosed position that the project was a fleet storage area requiring the highest level of stormwater treatment."  It contends these changes were "only because the Solicitation's design specification were (sic) deeply flawed."

ACC has failed to show a defective design specification.  The fact that neither the solicitation nor any other government pre-award consultations or studies identified the site as a hotspot is not a design specification imposing a particular way work is to be done within the meaning of *Spearin.*  The only specification was that ACC ascertain and comply with Virginia's stormwater management requirements to obtain the requisite state permits.  The solicitation did not purport to assure ACC that it could rely upon DEQ to interpret its regulations in a particular way.[5]  (Findings 5-6)  Also, as

---

[5] ACC contends that additional guidance cited in the solicitation says this hotspot may be treated as Level 2.  As best we can discern, it is referring to a non-DEQ publication called Pollution Source Control Practices, published in 2005 by the Center for Watershed Protection for the United States Environmental Protection Agency (R4, tab 36).  It is one of numerous source references listed at the end of Specification No. 8's main body (R4, tab 33 at 2026).  ACC seems to suggest that because state stormwater requirements were part of the contract, this

19

already noted, the government did not dictate, and DEQ did not conclude, that the site was a fleet storage area. Rather than demonstrate a defective specification, DEQ's instruction to ACC that the BMPs for this hotspot would only achieve Level 1 nutrient removal was an unforeseen event not caused by the government. ACC retained the risk of the resulting increased costs under this fixed price contract.

III.    Breach of the Duty of Good Faith and Fair Dealing/Failure to Intervene

ACC also contends that Mr. Higgins' fleet storage suggestion, allegedly prompting DEQ to restrict Mason & Hanger's BMPs to Level 1 nutrient removal, breached the duty of good faith and fair dealing. It says the government's failure to somehow intervene with DEQ on ACC's behalf and make it change its mind about its Level 1 determination also constitutes such a breach. The duty of good faith and fair dealing prohibits "interference with or failure to cooperate in the other party's performance." *LaBatte v. United States*, 899 F.3d 1373, 1379 (Fed. Cir. 2018) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981)). Although such a breach is not dependent upon the violation of an express contract term, a claim based upon it "cannot expand a party's duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Laturner v. United States*, 933 F.3d 1354, 1365 n.8 (Fed. Cir. 2019) (quoting *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019)). "[A] specific promise must be undermined for the implied duty to be violated." *Dobyns*, 915 F.3d at 739. It "must be 'keyed to the obligations and opportunities established in the contract,' so as to not fundamentally alter the parties' intended allocation of burdens and benefits associated with the contract." *Id.* (quoting *Lakeshore Eng'g. Servs.,* 748 F.3d at 1349).

Contrary to ACC's argument, Mr. Higgens did intercede on ACC's behalf in an attempt to convince DEQ that the site was not a hotspot. Though as part of that effort he opined that the site was an industrial fleet storage area, DEQ did not adopt that suggestion. (Finding 21) Nothing he did interfered with ACC's performance of the contract. Additionally, we reject ACC's contention that the government was under any obligation to advocate for ACC with DEQ or can be faulted for failing to convince it to

---

publication is incorporated into it. However, there is no indication that these listed references are part of Specification No. 8's provisions. This particular publication only generically discusses pollution prevention practices without focusing on the specific regulations of any particular jurisdiction within the country. Notably, it recognizes that vehicle storage areas are hotspots that are major contributors of hydrocarbon pollutants (R4, tab 36 at 2075-76). We cannot find any statement that bioretention basins draining such hotspots can meet Level 2 nutrient removal in Virginia. Even if the publication supported ACC's argument, to the extent DEQ deviated from it that is not the fault of the government. The government did not warrant DEQ's actions.

change its mind. ACC has not identified any provision of the contract imposing such a duty. Given that the contract placed complete responsibility upon ACC to navigate Virginia's regulatory requirements and obtain permitting, adopting ACC's argument would alter the contract's allocation of burdens and create duties inconsistent with its provisions (finding 6). ACC had no basis to expect such action. *See Kellogg Brown & Root Servs.*, 20-1 BCA ¶ 37,656 at 182,829 (rejecting the contention that the duty of good faith and fair dealing required the government to intervene on behalf of a contractor concerning another government's treatment of it); *see also Bell/Heery*, 739 F.3d at 1332-33. Furthermore, ACC has offered no evidence that the government possessed any leverage with DEQ that could have compelled it to alter its position. There was no breach of the duty of good faith and fair dealing.

### IV. Differing Site Condition

ACC also contends that the project's alleged classification as an industrial hotspot is a Type 1 differing site condition because the solicitation did not disclose that. Type I differing site conditions are "subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." FAR 52.236-2(a)(1); *see Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002). In addition to the fact that the site was never classified an industrial hotspot, (finding 23), ACC is not referring to the physical conditions it encountered at the site. If the site had been classified as an industrial hotspot that would have been a regulatory determination imposed upon the completed project based upon its development and use.[6]

### V. Superior Knowledge

Finally, ACC seeks recovery for the added costs of complying with DEQ's requirements, and for alleged delays by DEQ processing its permit application, upon the theory that the government breached a duty to disclose superior knowledge. "The superior knowledge doctrine imposes upon a contracting agency an implied duty to

---

[6] Though ACC does not advocate for it, for the same reasons the site would not constitute a Type II differing site condition, which involves "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR 52.236-2(a)(2).

disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000); *Kellogg Brown & Root Servs.*, 20-1 BCA ¶ 37,656 at 182,830-31. It generally applies where:

> (1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*Giesler*, 232 F.3d at 876 (citing *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)). "The corollary to this rule is that the Government is under no duty to volunteer information which the contractor can reasonably be expected to seek out himself," such as "in situations where the information at issue can readily be obtained from outside sources." *Petrofsky v. United States*, 616 F.2d 494, 497 (Ct. Cl. 1980); *JWK Korea Ltd.*, ASBCA No. 54198, 06-2 BCA ¶ 33,297 at 165,122.

ACC suggests that it did not know prior to the August 15, 2017, preconstruction meeting that DEQ might be difficult to satisfy and require multiple submissions. It says it also did not know the site was a hotspot and an industrial site. It maintains it had no reason prior to bidding to inquire into DEQ's most recent practices processing permit applications, or whether the site was a hotspot. It contends the government knew these facts prior to issuing the solicitation and should have notified it about them.

ACC's complaint that it was not informed of the government's judgment about the possibility that DEQ might be difficult or time consuming to satisfy is not referring to a fact existing prior to award, but upon a prediction. That is not a basis for a superior knowledge claim. *Kellogg Brown & Root Servs.,* 20-1 BCA ¶ 37,656 at 182,831 (rejecting a superior knowledge claim based upon the contractor's ignorance of a judgment or possibility rather than an existing fact) (citing *Northrup Gruman Corp. v. United States*, 47 Fed. Cl. 20, 90 (2000)); *see also Lee's Ford Dock, Inc.*, ASBCA No. 59041, 14-1 BCA ¶ 35,679 at 174,639 ("The theory of superior knowledge . . . normally relies on 'operative facts' in existence *before award*").

Even if we consider the claim to also encompass ACC's alleged lack of knowledge about DEQ's past practices, it has not established government liability for withholding superior knowledge. It is true that before issuing the solicitation the government recognized that DEQ had not approved initial submissions, could take up to 45 days to respond to subsequent submissions as permitted by Virginia law, would add

22

comments after each review, that prior projects had encountered difficulties complying with its requirements, and approval could take up to three months (finding 3). Rather than opine about the performance of state officials in the solicitation, the government sought a demonstration from offerors that they possessed knowledge and experience with Virginia's regulators and added 90 extra days to the period of performance (findings 3, 6). ACC's proposal informed the government that Mason & Hanger was very familiar with the installation from a civil engineering aspect, including permitting and stormwater requirements. It stressed Mason & Hanger's experience coordinating with DEQ and assured the government that its design would meet DEQ requirements. (Finding 7) Given these representations, the government was not obligated under the superior knowledge doctrine to educate ACC about what to expect from DEQ and had no reason to believe ACC and Mason & Hanger were not familiar with its practices. *See GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991) (holding the government had no reason to believe an experienced asbestos seller needed to be informed about the nature of its product or inquire into its specific knowledge). Even if ACC had not promoted Mason & Hanger's experience, ACC's contractual obligation to take full responsibility for complying with Virginia's requirements and obtain the necessary stormwater permitting established the reasonable expectation that it would familiarize itself with DEQ's recent procedures processing permits. *See Petrofsky*, 616 F.2d at 497. There is nothing novel about that. *Giesler*, 232 F.3d at 876 (restricting a superior knowledge claim to some novel information not provided by the government).

Additionally, contrary to ACC's contention, we have found Mason & Hanger did know that it was difficult to obtain approvals from all state environmental agencies, including DEQ (finding 7). Further, on August 1, 2017, two weeks prior to the preconstruction meeting, ACC established a schedule anticipating that DEQ would take nearly three months to initially review its SWPPP. Recognizing that at least one resubmittal would be necessary, it built two more months into the schedule for that. Thus, ACC expected DEQ to take at least five months to fully process its application, which is two more than the government had predicted. (Findings 3, 9) Also, when the government raised during the August 15, 2017, preconstruction meeting the difficulties of the DEQ process and the likely need for multiple submittals, ACC reiterated that Mason & Hanger was experienced and aware of the challenges (finding 10). Given these facts, ACC and Mason & Hanger possessed an understanding of DEQ's practices comparable to the government.

Once Mason & Hanger started submitting its SWPPP to DEQ, five months behind its original schedule, DEQ found multiple submissions contained inadequacies unrelated to the hotspot issue. Basic information was missing, as well as an appropriate stormwater management plan, drainage computations, BMP compliant

23

design, and proper VRRM spreadsheet runoff calculations. ACC was also required to consolidate disparate materials and address other unrelated problems. (Findings 9, 16-17, 27) ACC could not have believed that deficient submissions would be approved without resubmittal and review. The fact that its original schedule built in time for that shows it knew better (finding 9). There is no reason the government would expect that ACC would need to be told that inadequate submissions would not be approved and would delay issuance of a permit. Again, that is not novel. Moreover, ACC cannot claim that it lacked any basis to anticipate the time that it ultimately took to obtain DEQ approval. The contract expressly provided that some permits could take 180 days to obtain (finding 6). DEQ approved ACC's stormwater management plan 181 days after receiving the initial submission (finding 27). This was less than a month longer than ACC had originally estimated, despite the need for six submissions (findings 9, 27). Finally, ACC has not shown that DEQ exceeded its statutory time limits for acting on ACC's initial application and resubmittals, or why that would be the government's fault if it did.

ACC's suggestion that the government is liable under the Superior Knowledge doctrine because it was not given advance warning that the project was an industrial site for stormwater permitting is groundless because, as we have already noted, it was never subjected to such a determination. Its complaint about government superior knowledge that the site was a hotspot, dictating restricted infiltration, also fails for multiple reasons. First, the superior knowledge doctrine focuses upon a disparity in knowledge between the parties at the time of contract award. *See Lee's Ford Dock,* 14-1 BCA ¶ 35,679 at 174,639. There is no evidence the government knew the site was a hotspot at award. The first indication that anyone associated with the government suspected it might be one was when Mr. Lee examined Mason & Hanger's conceptual plan six months later and informed ACC and Mason & Hanger (finding 14).

Additionally, ACC's contention that, prior to award, neither it nor Mason & Hanger could be expected to consider whether the site was a hotspot is meritless. Again, the solicitation made clear that the contractor, not the government, would be responsible for ascertaining and complying with DEQ's requirements and obtain permits from it. That alone provided ample reason for Mason & Hanger to thoroughly study DEQ's rules governing its design, including whether the site might constitute a hotspot and the potential consequences if it was. The solicitation "did not mislead, but informed [ACC] of its obligations to obtain that knowledge." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007). A review of Specification No. 8 reveals that it restricts infiltration in hotspot areas, and Table 8.10 lists parking lots containing 40 or more spaces as hotspots (R4, tab 33 at 2004, 2023-24). Mr. Lynn knew that if a facility is listed on that table it is almost certainly a hotspot (finding 15). Specification No. 9 then bars the use of infiltrating bioretention to treat runoff from hotspots (R4, tab 30 at 1941-42). At the very least, the specifications placed Mason & Hanger on notice to consult with DEQ about the implications of its stormwater

24

design of a 900 vehicle parking area. DEQ publicly designated Mr. Cooper to perform that very function (finding 18). ACC and Mason & Hanger did not lack vital knowledge about DEQ's hotspot requirements; they had access to the same public information about the topic as everyone else. There is no basis for the government to expect that ACC and Mason & Hanger would not be familiar with the contents of DEQ's regulatory specifications respecting hotspots and infiltration. *See Petrofsky*, 616 F.2d at 497 (explaining the government is under no duty to volunteer information that the contractor can reasonably be expected to seek out itself). Once again, there is nothing novel about that.

Lastly, though ACC expends much effort concerning the site's hotspot designation, that is not the specific reason it incurred additional costs on Contech Jellyfish Filters. What forced those expenditures was DEQ's additional conclusion in July or August 2018 that, because the site was a hotspot requiring impermeable liners, the bioretention basins Mason & Hanger designed could not be considered Level 2 BMPs and therefore additional measures were required to meet Virginia's nutrient removal standards (findings 18, 24-25). It is possible that DEQ unexpectedly sprung that ruling on ACC because it had only begun amending Specification No. 9 to expressly provide for it at the time of the hearing (finding 24). But again, there is no evidence the government had any more reason to expect that declaration than ACC. Consequently, we reject ACC's superior knowledge claim.

CONCLUSION

The appeal is denied.

Dated: September 1, 2022

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur                                          I concur


_____                  _____
RICHARD SHACKLEFORD                              J. REID PROUTY
Administrative Judge                             Administrative Judge
Acting Chairman                                  Vice Chairman
Armed Services Board                             Armed Services Board
of Contract Appeals                              of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 62265, 62937, Appeals of
ACC Construction Co., Inc., rendered in conformance with the Board's Charter.


Dated:  September 1, 2022


_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

26